Don Roger **NORMAN**, Roger William Norman, South Meadows Limited Partnership, Plaintiffs,

v.

The **UNITED STATES**, Defendant.

No. 95–667.

United States Court of Federal Claims.

April 17, 2003.

Nancie G. Marzulla, Washington, D.C., attorney for plaintiffs. Roger J. Marzulla, Washington, D.C., of counsel.

Dorothy R. Burakreis, Washington, D.C., and Brian Heslin, Washington, D.C., for defendant. Lisa Clay, U.S. Army Corps of Engineers, Sacramento, California, of counsel.

## OPINION

BUSH, Judge.

This matter is before the court on defendant's motion for partial summary judgment and corrected memorandum in support of motion for partial summary judgment filed February 12, 2003 and defendant's corrected motion *in limine* to bar plaintiffs from challenging the validity of the government action that allegedly effected a taking in this case filed February 12, 2003. At the time of the events constituting the cause of action in this matter, plaintiffs were the owners of an approximately 2270 acre commercial/residential development in the Reno, Nevada metropolitan area, known as the "Double Diamond Ranch" (the Ranch). The basis of plaintiffs' complaint stems from the United States Army Corps' (the Corps) invalidation of a 1988 wetlands delineation in October 1990 and the issuance of a revised wetlands delineation in October, 1991. Plaintiffs' amended complaint claims a permanent taking of 193.11[1] acres on August 27, 1999, the date

---

1. Since the filing of the amended complaint, plaintiffs have re-measured the amount of prop-

the Corps issued a Section 404 permit to plaintiffs under the Clean Water Act, 33 U.S.C. § 1344 and claims a taking of the entitlement to build 2,446 residential units occurred on the same date. In the alternative, plaintiffs argue that defendant illegally exacted approximately 220.85 acres of land at the Ranch. For the following reasons, plaintiffs' third claim for relief (in the alternative), illegal exaction, presented in their amended complaint filed March 27, 2002, is dismissed for lack of subject matter jurisdiction and, accordingly, defendant's partial motion for summary judgment is also denied as moot. Plaintiffs' cross-motion for partial summary judgment is denied as moot. Defendant's corrected motion *in limine* to bar plaintiffs from challenging the validity of the government action that allegedly effected a taking in this case filed February 12, 2003 is granted in part, insofar as it seeks to prevent plaintiffs from directly challenging the validity and authorization of the government's actions which form the basis of plaintiffs' Fifth Amendment takings claim in this matter, and is denied in all other respects.

## BACKGROUND

### I. Factual background

For the purposes of this opinion, we adopt the following facts previously set forth by Judge Margolis in his earlier opinion on summary judgment in this matter. *See Norman v. United States,* 38 Fed.Cl. 417 (1997). They are as follows, with only minor modifications to reflect factual developments occurring since the filing of the opinion:

Plaintiffs in this case are a father and son, Don Roger Norman and Roger William Norman (Normans), and a limited partnership, South Meadows Properties Limited Partnership, that was formed to develop commercial and industrial office space on a parcel of land known as the Double Diamond Ranch in Reno, Nevada. The Ranch, which is comprised of approximately 2,425 acres of land, was used for ranching and agricultural activities for nearly 80 years. Because the area surrounding the Ranch receives an annual average of only 7.14 inches of natural rainfall,

the Ranch was flood irrigated with nearly six acre-feet of water per year per acre, through a complex system of irrigation ditches that criss-crosses the ranch property, in order to support ranching and agricultural activities.

In 1986, the Ranch was purchased by the Southmark Corporation, (Southmark), which intended to convert the property from agricultural and ranching use into a large-scale commercial and residential development. Southmark prepared a detailed and comprehensive Master Plan, which called for the construction of 7,000 residential units, 321 acres of commercial space, and 37 acres of retail shops on the former ranch property. The Master Plan also called for the construction of roads, schools, churches, fire stations, recreational trails, parks, etc.—in short, the plan contained all of the elements necessary for the development of a self-contained community.

On January 30, 1987, the Reno City Council conditionally approved Southmark's Master Plan and zoning requests by adopting a resolution of intent approval. However, the City Council's resolution of intent approval contained 41 separate and detailed conditions that Southmark was required to satisfy concerning traffic, transportation, permits, etc. In one of these conditions, condition 15, the City Council stated that "[p]rior to the issuance of any permit, or the commencement of any site work, [the developer] shall submit plans approved by the [Army] Corps of Engineers delineating wetlands or any other lands the development of which are subject to the issuance of Federal permits."

The Army Corps of Engineers had previously contacted Southmark in August 1986 concerning the possible existence of wetlands at the Ranch that might be impacted by the proposed Master Plan. At that time, the Corps conducted a preliminary assessment of the Ranch property and concluded that from 50% to 75% of the property—approximately 1300 acres—appeared to contain possible wetland vegetation. Although the Corps' preliminary assessment did not represent a "Final Wetlands Determination," Southmark disagreed with the Corps' conclusion on the

erty in question and apparently are now claiming

a taking of 220.85 acres of Ranch land.

grounds that most of the vegetation on the property was present as a direct result of 80 years of artificial flood irrigation. Therefore, on March 16, 1987, Southmark suspended all artificial irrigation of the Ranch in an effort to ensure that the Corps of Engineers could evaluate hydrologic conditions on the Ranch under "normal circumstances" when it did prepare its Final Wetlands Delineation.

Southmark's suspension of artificial irrigation activities continued, without interruption, from 1987 until 1988. In June 1988, a team of wetlands experts from the Corps of Engineers—a delineation team—was sent to the Double Diamond Ranch to conduct the field work needed to prepare a Final Wetlands Delineation. The delineation team visited the Ranch for one week, from June 6 to June 10, 1988, and gathered data from 32 sites throughout the Ranch to determine what portions of the Ranch property, if any, exhibited the three characteristics—(1) hydrology, (2) hydric soil, and (3) hydrophytic vegetation—necessary to classify that land as "jurisdictional wetlands."

Using the field data gathered by the delineation team in June 1988, the Corps issued a report concerning the Double Diamond Ranch property on September 12, 1988. The Corps' 1988 delineation, which was prepared pursuant to the 1987 version of the Corps of Engineers Wetlands Delineation Manual, (the 1987 manual), concluded that the Ranch property contained 28 acres of jurisdictional wetlands. The 1988 delineation included a map setting forth the precise location of all 28 acres of jurisdictional wetlands identified by the Corps of Engineers.

Shortly after the Corps of Engineers issued its 1988 delineation, Southmark sold the Ranch property to two entities—Double Diamond Ranch Limited Partnership, (DDR), a Nevada limited partnership; and G & E General Contractors, (G & E), a Nevada corporation. The sale of the Ranch, for a total purchase price of $20 million, was closed on December 30, 1988. The sale was structured so that DDR took title to approximately 1800 acres of the Ranch which had been designated for residential development (the Residential portion), while G & E took title to approximately 470 acres of Ranch land that had been designated for commercial, industrial and retail development (the Commercial portion). DDR paid $11.6 million for the Residential property, while G & E paid $8.4 million for the Commercial property.

Following the sale, G & E and DDR entered into an agreement, entitled "Development Agreement," whereby the two entities agreed to work together to develop the Residential and Commercial portions of the Ranch property. The Development Agreement was signed by Robert L. Helms, the president of an entity known as Prime Time Developers, Inc., on behalf of DDR, and by Lance Gilman, president of G & E, on behalf of G & E. Under the agreement, DDR agreed to construct certain offsite improvements such as roads, curbs and gutters, utilities, etc., necessary for the development of the Commercial property. For its part, G & E agreed to ensure satisfaction of the 41 development conditions that had been imposed by the city of Reno in its conditional approval of Southmark's Master Plan. The agreement also addressed the allocation of water rights between the Commercial and Residential development. In addition, both parties agreed "to meet on a regular basis (at least annually)" to discuss traffic mitigation measures. Finally, the parties acknowledged "that the development of the Commercial Property and the Residential Property will require their continued cooperation and best efforts," and therefore they agreed "to fully cooperate with each other in the development" of the Ranch. Beyond these provisions, the Development Agreement left the parties free to develop their respective portions of the project independently.

Plaintiffs, Don and Roger Norman, acquired the Commercial portion of the Ranch through a tax-free exchange with G & E General Contractors that was consummated on December 30, 1988. However, title to the Commercial property was not transferred from G & E to the Normans until June 20, 1989, when title was transferred to two trusts—the Don Roger Norman Trust and the Roger William Norman Trust. The Normans later quitclaimed their ownership in the 470 acres of Commercial property to plaintiff South Meadows Properties Limited Partner-

ship, a partnership whose limited partners are plaintiffs Don Roger Norman and Roger William Norman, and Lance Gilman. The Normans did not become parties to the 1989 Development Agreement until September 30, 1991, when the Normans and Robert Helms executed a document entitled "Amendment to Development Agreement," which amended the original Development Agreement between DDR and G & E. This amended agreement first recited the fact that G & E had conveyed "all of its obligation, right, title and interest in the [commercial] property ... and in the [1989] Development Agreement ..." to the Normans. The amended agreement, like the original Development Agreement between DDR and G & E, called for Helms and the Normans to cooperate in the construction and financing of certain offsite improvements.

In the months following the sale of the Double Diamond Ranch from Southmark to plaintiffs and Robert Helms, a storm of controversy arose concerning the Corps of Engineers' 1988 delineation. The 1988 delineation was severely criticized by the general public, by environmental groups, and even by employees of the Corps of Engineers and other federal agencies, including the Environmental Protection Agency, and the U.S. Fish & Wildlife Service. As a result of this criticism, the Corps informed plaintiffs, by letter dated October 9, 1990, that the 1988 wetlands delineation of the Double Diamond Ranch was "no longer valid," and that a new delineation of the Ranch property was required. The Corps of Engineers' October 9, 1990 letter explained that the 1988 delineation may have been inaccurate because the delineation team utilized a growing season that was not appropriate for Truckee Meadows, the area where the Double Diamond Ranch is located. Therefore, the Corps informed plaintiffs that the Corps would conduct a new delineation, utilizing the proper growing season for Truckee Meadows. In the meantime, the October 1990 letter from the Corps warned that plaintiffs "should not undertake any further activity which results in the discharge of dredged or fill material into areas containing wetland vegetation until a new delineation is completed."

In April 1991, a delineation team from the Army Corps of Engineers returned to the Ranch to collect data for a new wetlands delineation. The delineation team collected data from 108 sites across the property from April 9–12, 1991. The team returned to the Ranch from April 25–26, 1991, to collect data from an additional 18 sites. Using this data, and following the procedures set forth in the 1989 version of the Corps of Engineers Wetlands Delineation manual (the 1989 manual), the Corps prepared a new delineation (the 1991 delineation; the redelineation) of the Double Diamond Ranch. Whereas the 1988 delineation had identified only 28 acres of wetlands, the 1991 delineation identified 230 acres of jurisdictional wetlands on the Ranch property.

On August 17, 1991, before the Corps could forward the results of its 1991 redelineation to plaintiffs, Congress enacted and President George Bush signed Public Law No. 102–104, The Energy and Water Development Appropriations Act of 1992 (Public Law No. 102–104). This legislation expressly provided: "None of the funds in this Act shall be used to identify or delineate any land as a 'water of the United States' under the Federal Manual for Identifying and Delineating Jurisdictional Wetlands that was adopted in January 1989." Pub.L. No. 102–104, 105 Stat. 510 (1991). It further provided that, in cases where the Corps of Engineers had begun, but had not yet completed, the process of delineating property pursuant to the 1989 manual at the time the law was enacted,

> the landowner or permit applicant shall have the option to elect a new delineation under the Corps 1987 Wetlands Delineation Manual, or completion of the permit process or enforcement action based on the 1989 Manual delineation, unless the Corps of Engineers determines, after investigation and consultation with other appropriate parties, including the landowner or permit applicant, that the delineation would be substantially the same under either the 1987 or 1989 Manual.

*Id.*

The results of the 1991 redelineation were forwarded to plaintiffs in a letter from the Corps of Engineers dated October 9, 1991.

In a letter to Robert Junnell of the Corps of Engineers, also dated October 9, 1991, plaintiffs informed the Corps that they did not intend to request a redelineation of the residential portion of the Ranch under the 1987 manual, as they could have requested under Public Law No. 102–104. On October 10, 1991, the Corps of Engineers informed plaintiffs, by letter, that the Corps had determined that the delineation of the Double Diamond Ranch under either the 1987 of 1989 manuals would be substantially the same, and asked plaintiffs for their input. In response, plaintiffs sent a letter to Robert Junnell of the Corps of Engineers on October 30, 1991, in which plaintiffs stated their belief that "a technically competent wetland delineation of the Double Diamond Ranch completed pursuant to either [the 1987 or 1989] manual should result in substantially similar results. For this reason, we will not request a redelineation of the property under the 1987 manual."

The effect of the 1991 delineation on plaintiffs' subsequent efforts to develop the Double Diamond Ranch is the subject of much dispute between the parties. Plaintiffs allege that the Corps of Engineers' rescission of the 1988 delineation, and the Corps' subsequent delay in issuing a Final Wetlands Determination, were fatal to plaintiffs' and Helms' efforts to carry out Southmark's Master Plan for development of the Double Diamond Ranch. Defendant, on the other hand, maintains that the difficulties experienced by the plaintiffs and Helms were caused by plaintiffs' and Helms' own actions. Whatever the cause, it is clear from the evidence presented in the record that the development of the Ranch property did not proceed according to Southmark's original Master Plan.

Shortly after the Corps released the 1991 wetlands delineation, plaintiffs embarked on a plan to develop the 470 acres of Commercial property in phases. In November 1991, plaintiffs applied to the City for a master plan amendment and zoning map amendments to develop a portion of the Commercial property, covering 210 acres, as a

Planned Unit Development. (PUD). According to documents submitted to the City, plaintiffs' intended plan to develop this 210-acre tract—which was referred to in plaintiffs' PUD application as "South Meadows Planned Development Phase I"[2]—was to include commercial, industrial, office and multi-family residential components. On February 25, 1992, the City Council tentatively approved plaintiffs' plans to proceed with the development of Phase I of the Commercial property as a PUD.

In late 1994, plaintiffs began to pursue development of the Residential portion of the Double Diamond Ranch, as well as the Commercial portion, as a Planned Unit Development. On September 29, 1994, plaintiff South Meadows Properties purchased the 1802-acre Residential property from the bankruptcy estate of Robert Helms, for a total purchase price of $30 million. In November 1994, plaintiffs filed a petition with the City to reannex the Residential portion of the Ranch. At the same time, plaintiffs sought a master plan amendment and zoning for a PUD for the Residential portion of the Ranch. On January 10, 1995, plaintiffs received conditional approval from the City to develop the Residential portion of the Ranch as a PUD.

In January 1995, plaintiffs submitted an application to the Corps of Engineers for a permit under section 404 of the Clean Water Act (section 404 permit). In their application, plaintiffs sought approval from the Corps to impact 13 acres of wetlands, and 2 acres of other waters of the United States, as part of plaintiffs' plan to develop the entire 2,288-acre Double Diamond Ranch property for commercial, industrial and residential uses. To mitigate the impact of the proposed development on wetlands and other waters, plaintiffs proposed to "create[ ] additional wetlands to ensure no net loss of wetlands functions and values." Plaintiffs' mitigation proposal called for creation of 20.6 acres of replacement wetlands, or approximately 1.37 acres of mitigation for each acre

2. According to plaintiffs' PUD application, plaintiffs changed the name of their proposed commercial development to the "South Meadows Planned Development" when they applied for approval of the project as a PUD "to eliminate any confusion that might arise between this project and the Double Diamond residential development that is being undertaken by others."

of wetlands impacted. Plaintiffs' application-including the proposed mitigation scheme-was approved by the Corps, and a section 404 permit was issued to plaintiffs on May 22, 1995.

In addition, the following facts have transpired since the court's 1997 opinion in *Norman*. On March 27, 1998, and following pre-application meetings, South Meadows Properties submitted an application for a permit under Section 404 of the Clean Water Act. Plaintiffs proposed to construct a multipurpose commercial, industrial and residential development on approximately 2,500 acres. Discussion of various proposals ensued. In July of 1999, South Meadows Properties and Double Diamond Ranch submitted a revised mitigation and monitoring plan.

On August 27, 1999, the Corps issued permit number 199825043 to South Meadows Properties, L.P. and Double Diamond Ranch, LLC (an adjoining property owner). Pursuant to this permit, plaintiffs are authorized to disturb a total of 74.09 acres of wetlands and .70 acres of other waters of the United States, 61.56 acres of which are wetlands designated by the 1991 delineation. Twenty-one of the 74.09 acres that may be filled are in the area east of Double R Boulevard (formerly known as Moana Lane) while the remaining acres are west of Double R Boulevard (in the commercial property). Pursuant to this permit, plaintiffs were required to dedicate approximately 220.85 [3] acres of land on the Double Diamond Ranch as a wetland and wildlife habitat. All but approximately eleven acres of this land lies on the "residential" portion of the property.

In brief, as a condition of the 1999 permit, plaintiffs were required to form a Corps approved funding mechanism for the long term maintenance of the mitigation and preserve areas, and to record deed restrictions maintaining all mitigation and preserve areas as wetland preserves and wildlife habitat in perpetuity. The permit required that the Corps approve these deed restrictions prior to recordation, and these deed restrictions prohib-

it plaintiffs from engaging in any of the following prohibited activities: (1) No commercial, industrial, agricultural or residential developments, structures or buildings shall be allowed or permitted in the protected area; (2) no mowing or burning, dewatering, plowing or cultivation of the wetlands area of any portion of such area, and no destruction of any natural plants within such area shall be done or permitted; (3) no leveling, grading or landscaping within the wetlands area or any portion of such area; and (4) no destruction or removal of any natural tree, shrub or other vegetation that exists upon the wetlands area. The restrictions further provide that the upland area shall be maintained as open space. *See* Def.'s Ex. 30, App. 0170–72. These restrictions "implement the provisions of the permit requiring a binding covenant running with the land, but shall not be construed to impose restrictions in addition to those provided for in the permit..." *Id.* at App. 0171. Finally, the permit requires that the Normans finance and maintain this preservation area in perpetuity by conditioning the permit on "the formation of a Corps approved funding mechanism for the long term maintenance of the mitigation and preserve areas." South Meadows, Inc. (Plaintiffs) Section 404 Permit at 5, ¶ 9 (August 31, 1992), Def. Ex. 37, App. 0314.

The present suit was initiated on October 5, 1995. In their amended complaint (as it presently stands) filed March 27, 2002, plaintiffs allege that defendant the United States took for public use approximately 193.11 acres of plaintiffs' commercial property, which had a fair market value at the time of taking of $25,000,000. Plaintiffs further aver that (1) the actions of defendant also have taken for public use the entitlement to build 2,446 residential units, which would have been constructed upon the Double Diamond Ranch property; and (2) the government's actions also substantially reduced the value of the remainder of the Ranch by requiring down-scaling of commercial development and redesign of the highway configuration to accommodate wetlands and "other waters" de-

---

3. As previously stated, the precise acreage of the mitigation lands has been unclear since the commencement of this suit. The court draws this most recent figure from plaintiffs' opposition to defendant's motion for partial summary judgment. The precise acreage figure will be determined at trial, as it is largely irrelevant to the currently pending motions.

lineated by the Corps in their second and third delineation maps. They claim the fair market value of the residential unit entitlement is $17,122,000. Plaintiffs seek damages in the amount of the just compensation allegedly denied to them in violation of the Constitution of the United States and costs incurred, together with interest at the legal rate from the date of taking. In the alternative, plaintiffs claim an illegal exaction, and contend that by reason of the 1999 permit requirement, which is predicated on the 1991 redelineation of the Double Diamond Ranch and was allegedly completed by defendant United States in violation of Public Law No. 102–104, plaintiffs were required to dedicate for public use in perpetuity 193.11 acres of plaintiffs' land in violation of Pub.L. 102–104 and the Fifth Amendment to the United States Constitution. Plaintiffs further contend that they are entitled to recover for expenses on either a takings theory or an illegal exaction theory. These expenses include: "(a) nearly $2 million in fees paid to scientists, engineers, surveyors, architects, hydrologists, botanists, attorneys and other professionals whose services were required to assist the Corps in its wetland delineation; and (b) approximately $1 million for construction of mitigation projects required by the Section 404 permit."

## II. Procedural history

Plaintiffs commenced this suit on October 5, 1995. In 1996, plaintiffs moved for partial summary judgment solely on the issue of liability and the government cross-moved for summary judgment on the entire case. On August 12, 1997, Judge Margolis issued an opinion granting the governments' cross-motion to dismiss on the breach of contract claim, granting the government's motion to dismiss the claims of temporary and permanent takings of the residential property, and denying the government's cross-motion for summary judgment on the claims of permanent and temporary takings of the commercial property. *Norman,* 38 Fed.Cl. at 430.

On January 27, 1999, the case was reassigned to Judge Bush. On September 21, 1999, the government moved for summary judgment on the claims of a temporary and permanent taking of the commercial property. On November 9, 1999, plaintiffs filed their opposition to defendant's motion for summary judgment and cross-motion for partial summary judgment on the character of the government's actions and the reasonableness of plaintiffs' investment-backed expectations. Oral argument was held on the pending motions on October 27, 2000. On November 9, 2000, the court stayed proceedings on the pending motions for summary judgment until the parties filed court-ordered additional briefing on the issues of (1) whether the 1991 delineation was ultra vires; and (2) whether under *Del–Rio Drilling Programs Inc. v. United States,* 146 F.3d 1358 (Fed.Cir.1998), and other applicable precedent, plaintiffs can bring suit in this court for a Fifth Amendment Takings claim based on an ultra vires delineation. On January 19, 2001, plaintiffs and defendant filed their respective supplemental briefs in response to the court's order of November 9, 2000. On February 26, 2001, over the objection of plaintiffs' counsel on relevancy grounds, the court deferred the resolution of defendant's motion for summary judgment and plaintiff's cross-motion pending the decision of the Supreme Court in *Palazzolo v. Rhode Island,* No. 99–2047.

On August 20, 2001, plaintiffs filed a motion for leave to amend their original complaint based, in large part, on the Supreme Court's decision in *Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), which was issued on June 28, 2001, as well as the change of circumstances in the case that had occurred since the original complaint was filed in 1995. The proposed amended complaint: (1) eliminated the breach of contract claim on which Judge Margolis granted summary judgment to defendant in 1997; (2) revised the permanent taking claim to allege a right to just compensation for 193.11 acres which plaintiffs were required to dedicate to public use in perpetuity by the August 27, 1999 wetlands permit; (3) reinstated plaintiffs' claim for the taking of the residential property acquired in 1994 in accordance with the holding in *Palazzolo*; and (4) added a new claim for illegal exaction. On September 20, 2001, defendant filed its response in opposition to

plaintiffs' motion for leave to amend complaint. On September 20, 2001, the government filed its response in opposition to plaintiffs' motion for leave to amend the original complaint.

On March 27, 2002, the court issued an order wherein it granted, *inter alia*, plaintiffs' motion for leave to amend original complaint, filed August 20, 2001 and, in an attempt to elicit a more definitive statement and elucidation of the parties' legal positions in this case, posed an extensive list of questions/issues which the court directed the parties to address in future proceedings in this matter.[4] The court had been particularly frustrated by plaintiffs' failure to clearly set forth their claim(s) in the first instance, as evidenced by pleadings and dispositive motions, which often contained under-developed conclusory and summary pronouncements instead of fully developed legal analyses essential for the explanation and support of a claim. Shortly after the issuance of the court's March 27, 2002 Order, which extensively addressed plaintiffs' temporary takings claim with thirteen separate detailed queries on that particular issue, plaintiffs decided to dismiss the claim with prejudice, stating that such dismissal would "... simplify this case for trial and ... achieve prompt resolution of this lawsuit ...." The defendant's pending motion for summary judgment and plaintiffs' opposition thereto and cross-motion for partial summary judgment were rendered moot through the filing of the amended complaint. On April 10, 2002, the government filed its answer to the amended complaint.

On May 21, 2002, the court issued an order granting plaintiffs' motion to dismiss with prejudice its temporary takings claim, submitted in its Status Report filed May 20, 2002. The Clerk of the court was directed to dismiss with prejudice plaintiffs' temporary takings claim (second claim for relief) in its amended complaint filed March 27, 2002. Accordingly, this claim was dismissed with prejudice on May 21, 2002.

On June 10, 2002, the court issued an order pursuant to the court's May 28, 2002 telephonic status conference wherein it set forth a schedule for the completion of discovery and ordered that discovery would be closed on or before October 31, 2002. Also, this order set dates for the parties to file their respective statements of relevant factual and legal issues. On November 15, 2002, counsel for the parties and the court engaged in a telephonic preliminary scheduling conference. The court set trial to commence on April 8, 2003 in Reno, Nevada and established a schedule for the submission of pretrial filings, parties' joint stipulation of facts and joint exhibit list.

In an unexpected turn and at the eleventh hour, on February 12, 2003, in the midst of pretrial filings and preparation by both counsel and the court, the government filed (1) its motion for partial summary judgment and corrected memorandum in support of motion for partial summary judgment; and (2) its corrected motion *in limine* to bar plaintiffs from challenging the validity of the government action that allegedly effected a taking in this case.[5] On February 12, 2003, the court held a telephonic status conference to discuss procedural matters precipitated by the government's unexpected filing of the above-referenced motions. The court determined, without making any determination on

---

4. The order contained nine pages of questions and issues which the court deemed unaddressed and/or incompletely addressed by counsel, yet necessary, at a minimum, in order to make the claims, facts and legal arguments before the court sufficiently complete and comprehensible such that the court could discern the parties' respective positions on the legal intricacies of this case. The March 27, 2002 Order expressed the court's continuing frustration in this regard, stating, in most constrained and temperate terms that:

> Unfortunately, much of the previous briefing submitted to the court was not sufficiently focused or in-depth enough to adequately cover

many of the salient issues in this matter. This has made the court's task of interpreting the parties' positions and arguments all the more pain-staking and time-consuming. Given the novelty and complexity of the issues in the case at bar, and based on questions that have arisen during the court's consideration of previous briefs submitted in this matter, this court deems it necessary to order that any future dispositive motions and related pleadings on the merits shall, *inter alia*, directly address the following issues....

5. The uncorrected versions of these pleadings were originally filed on February 6, 2003.

the merits of the government's newly-filed motions, that the issues raised in the government's briefs were properly before the court and contained substantive matters that needed to be addressed prior to proceeding with trial. Accordingly, on February 12, 2003, the court issued an order setting forth a newly-formed schedule for proceedings. The court also deferred the trial previously scheduled to commence on April 8, 2003 until such time as the court has completed its consideration of the government's motion for partial summary judgment and motion *in limine* filed February 12, 2003.

On March 7, 2003, plaintiffs filed their opposition to defendant's motion for partial summary judgment and their opposition to defendant's motion *in limine*. In turn, on March 19, 2003 defendant filed its reply briefs thereto. On March 28, 2003, the court heard oral argument on the government's motion for partial summary judgment and motion *in limine* and plaintiffs' responses thereto.

On March 14, 2003, the court issued an ordered wherein it granted defendant's motion to suspend the filing of stipulations of fact and joint exhibit list. The court stated that at a point it deems appropriate, it would confer with the parties and set a revised date for the filing of agreed upon stipulations of fact and joint exhibit list.

Recently a flurry of motions have been filed in this case, including: (1) defendant's motion to enforce order and motion to strike and request for expedited consideration filed March 7, 2003; (2) plaintiffs' motion to request that the court reschedule trial filed March 14, 2003; (3) plaintiffs' motion for costs and attorney fees filed March 18, 2003; (4) plaintiffs' motion and memorandum supporting their motion to strike defendant's additional witnesses and exhibits filed March 20, 2003; and (5) plaintiffs' motion for expedited briefing and consideration filed March 20, 2003.

## DISCUSSION

### I. Defendant's motion for partial summary judgment

#### A. Standard of review

Currently pending before this court is defendant's motion for partial summary judg-

ment and plaintiffs' opposition thereto. Summary judgment is designed to secure the " 'just, speedy, and inexpensive determination of every action.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Federal Rule of Civil Procedure 1). Summary judgment is appropriate where there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the United States Court of Federal Claims (RCFC); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is material if it would affect the outcome of the suit. *Id.* at 248, 106 S.Ct. 2505.

In considering a motion for summary judgment, the court does not "weigh[ ]" each side's evidence. *Contessa Food Products, Inc. v. Conagra, Inc.,* 282 F.3d 1370, 1376 (Fed.Cir.2002). Rather, "the court views the evidence and any disputed factual issues in the light most favorable to the party opposing the motion." *Enzo Biochem, Inc. v. Gen–Probe Inc.,* 285 F.3d 1013, 1017 (Fed. Cir.2002). That is, all doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). However, the non-moving party has the burden of producing sufficient evidence that there is a genuine issue of material fact in dispute which would allow a reasonable finder of fact to rule in its favor. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. Such evidence need not be admissible at trial; nevertheless, mere denials, conclusory statements or evidence that is merely colorable or not significantly probative is not sufficient to preclude summary judgment. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2554; *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511; and *Mingus,* 812 F.2d at 1390–91.

#### B. Plaintiffs' illegal exaction claim

Plaintiffs claim in the alternative to their takings claim, an illegal exaction. Specifically, plaintiffs allege that their land was illegally exacted in violation of Public Law No. 102–104, the Energy and Water Development

Appropriations Act of 1992, appropriated funds for fiscal year 1992, enacted on August 17, 1991, which forbade the expenditure of any funds by the Corps to delineate wetlands under the 1989 Federal Manual. Public Law No. 102–104 provides, in pertinent part, as follows:

> None of the funds in this Act shall be used to identify or delineate any land as a "water of the United States" under the Federal Manual for Identifying and Delineating Jurisdictional Wetlands that was adopted in January 1989 (1989 Manual) or any subsequent manual not adopted in accordance with the requirements for notice and public comment for the rule-making process of the Administrative Procedure Act.
>
> In addition, regarding Corps of Engineers ongoing enforcement actions and permit application involving lands which the Corps or EPA has delineated as waters of the United States under the 1989 Manual, and which have not yet been completed on the date of enactment of this Act, the landowner or permit applicant shall have the option to elect a new delineation under the Corps 1987 Wetland Delineation Manual, or completion of the permit process or enforcement action based on the 1989 Manual delineation, unless the Corps of Engineers determines, after investigation and consultation with other appropriate parties, including the landowner or permit applicant, that the delineation would be substantially the same under either the 1987 or the 1989 manual.

Pub.L. No. 102–104, 105 Stat. 510 (1991).

Apparently this prohibition on use of the 1989 manual arose because it was not subjected to the rulemaking process of the Administrative Procedure Act, which would have given landowners and the public notice and opportunity to be heard on the changes made. *See* S.Rep. No. 102–80, at 54–55 (1991).

Plaintiffs contend that funds were expended on delineation of the Double Diamond Ranch as late as October 30, 1991, when the Corps claims the 1991 delineation became final. Pl. Opp.[6] at 4 (citing Letter from Arthur Champ, Chief of Regulatory Section, Corps of Engineers to Sarah Miller, Reno Planning Commission (March 18, 1992)). Plaintiffs further state that funds were expended to delineate the subject property on or about October 9, 1991, when a draft of the redelineation which had been commenced in April of 1991 (prior to the enactment of Public Law No. 102–104), was prepared and sent to plaintiffs. The court again notes that, as discussed above in the factual background section, in letters dated October 9 and October 30, 1991, plaintiffs informed the Corps that they did not intend to request a redelineation of the residential portion of the Ranch under the 1987 manual, as they could have requested under Public Law No. 102–104.

Public Law No. 102–104 is the only statute, regulation, or constitutional provision of which plaintiffs claim a violation. At oral argument, plaintiffs confirmed this fact. During oral argument, the court expressly asked counsel for plaintiffs: "Exactly what acts do Plaintiffs specifically allege were illegal or unlawful?" Transcript of March 28, 2003 oral argument filed April 2, 2003, at 43. Mr. Marzulla replied:

> The completion of the delineation process, which is a final agency action, Your Honor ... A delineation is final, is the final agency action and the regulatory determination of the Corps of Engineers once it is approved by the district engineer. It is that action which we understand occurred on or after—sometime after—October 30th, 1991, which was illegal. So all of this stuff that was called wetland in fact wasn't wetland at all. This 60–some acres that counsel referred to that the Normans were forbidden to use, it wasn't wetland at all because it was wetland only under the 1989 manual.... And in fact, what should have happened, of course, is the Corps should have gone back to the original delineation.

Transcript at 43–44.

■ An illegal exaction claim is the only Due Process clause claim over which this

court possesses jurisdiction. *See Casa de Cambio Comdiv v. United States,* 291 F.3d 1356, 1363 (Fed.Cir.2002). The Federal Circuit has stated in *Aerolineas Argentinas v. United States,* 77 F.3d 1564, 1578 (Fed.Cir. 1996) "[w]e conclude that the Tucker Act provides jurisdiction to recover the sums exacted illegally . . . due to [a] misinterpretation or misapplication of statutes, regulations, or forms." The parties agree, and it is clear from controlling precedent, that " 'the jurisdictional hook of the illegal exaction doctrine,' " is property which was claimed to have been " 'exacted as a direct result of the application of a statute or a regulation.' " Pl. Opp. at 8 (quoting *Casa de Cambio Comdiv v. United States,* 48 Fed.Cl. 137, 145 (2000), *aff'd, Casa de Cambio Comdiv v. United States,* 291 F.3d 1356 (Fed.Cir.2002) (further citation and internal quotations omitted)); Def. Mot. at 12.[7] *See also Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 372 F.2d 1002, 1007–08 (1967) (stating that "We have referred to these cases as those in which the Government has the citizens' money in its pocket and the claim is to recover an illegal exaction made by officials of the Government, *which exaction is based upon a power supposedly conferred by a statute*") (internal quotations omitted) (emphasis added); *Clevenger Roofing & Sheet Metal Co. v. United States,* 8 Cl.Ct. 346, 352 (1985) (quoting *Eastport,* 372 F.2d at 1008). Although this case is presently before the court on defendant's motion for partial summary judgment, significantly, pursuant to RCFC 12(h)(3) "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."

▮ Plaintiffs' claim for illegal exaction in this case is based upon the Army Corps' completion of the 1991 delineation allegedly in contravention of Public Law No. 102–104, which forbade the expenditure of funds for delineations based upon the 1989 manual. But as the Federal Circuit has expressly stated, "the Tucker Act provides jurisdiction to recover the sums exacted illegally . . . *due to* [a] misinterpretation or misapplication of statutes, regulations, or forms." *Aerolineas,* 77 F.3d at 1578 (emphasis added). In the case at bar, however, this jurisdictional requisite is not satisfied because plaintiffs' property was not exacted illegally *due to* a misapplication of this statute. Although it is true that Public Law No. 102–104 *may have been* violated through the expenditure of these funds, it is not through that specific misapplication of this statute that property was "exacted" from plaintiffs. The end result with respect to Public Law No. 102–104 is that at least some appropriated funds may have been used in the Corps' completion of the 1991 delineation. The use of these funds, however, did not directly result in what plaintiffs contend is the exaction in this case. Public Law No. 102–104 was, in the context of plaintiffs' illegal exaction claim, an enabling device which the Corps allegedly used to fund the completion of the redelineation of the Ranch under the 1989 manual. However, misapplication of Public Law No. 102–104 did not directly result in an exaction and the delineation of plaintiffs' property was not, in the language of *Eastport,* 372 F.2d at 1008 "based upon" Public Law No. 102–104 so as to satisfy the jurisdictional requisite for maintaining an illegal exaction claim in this court.[8] In other words, Public Law No. 102–104 was not the instrument through which plaintiffs' property was exacted, it was merely an appropriations act, and, as such, plaintiffs cannot maintain an illegal exaction claim based exclusively on the violation of this act.

The governmental act for which plaintiffs wish to recover, at the core, is the Corps' 1991 decision to redelineate the Ranch and repudiate the 1988 delineation, upon which

---

7. Def. Mot. refers to defendant's motion for partial summary judgment and corrected memorandum in support of motion for partial summary judgment filed February 12, 2003.

8. The critical and marked distinction between the alleged violation of Public Law No. 102–104 and any "exaction" in this case can be illustrated by considering the following: Assume, arguendo, that Public Law No. 102–104 had been violated through expenditure of funds to complete the delineation of the Ranch, yet the application of the 1989 manual had resulted in a delineation of no wetlands on the Ranch property. In this instance, the same alleged violation of Public Law No. 102–104 would stand, yet plaintiffs would have no claim for an exaction.

plaintiffs relied in purchasing at least the commercial portion of the Ranch. Plaintiffs also disagree with the correctness of the wetlands determination. Significantly, however, in support of their illegal exaction theory, plaintiffs have not pointed to any statute or regulation other than Public Law No. 102–104 which they allege was misapplied or misconstrued. In sum, any "exaction" of plaintiffs' property in this case did not stem from a "direct result of the application of a statute." *See Casa de Cambio,* 48 Fed.Cl. at 145. *See also Clapp v. United States,* 127 Ct.Cl. 505, 117 F.Supp. 576, 580 (1954) (stating that "a claim to recover an illegal exaction made by officials of the Government, *which exaction is based upon a power supposedly conferred by a statute,* is a claim 'founded upon any Act of Congress' ") (emphasis added). Thus, plaintiffs may not, under the present state of illegal exaction jurisprudence, seek recovery for the Corps' redelineation of the property and delineation of wetlands through their indirect claim of a violation of Public Law No. 102–104. Accordingly, this court lacks subject matter jurisdiction to entertain plaintiffs' illegal exaction claim.

Because this court has concluded that it lacks jurisdiction to hear plaintiffs' illegal exaction claim, it is not necessary for the court to consider either whether it may lack jurisdiction over this claim for the other reasons presented by the government in its motion for summary judgment, including: (1) whether plaintiffs' case presents a situation where money or property was exacted as a direct result of the application of a statute or a regulation; (2) whether an illegal exaction claim can lie for something other than money; and (3) whether a proscription of plaintiffs' use of property may be considered under illegal exaction jurisprudence. Further, it is not necessary for this court to proceed to consider issues presented in the government's motion for partial summary judgment, including: (1) whether the redelineation was performed in contravention of Public Law No. 102–104; (2) how much money, if any, was spent in violation of Public Law No. 102–

104 in performing the 1991 redelineation; (3) the effect of plaintiffs' decision to not request a redelineation of the Ranch under the 1987 manual, as they were entitled to request under Public Law No. 102–104; and (4) whether there exist genuine issues of material fact precluding the grant of partial summary judgment. Accordingly, defendant's motion for partial summary judgment is denied as moot.

## II. Defendant's motion *in limine*

### A. Overview

Defendant filed its motion *in limine* pursuant to RCFC 16 for the purpose of resolving certain issues prior to trial in this matter. Motions *in limine* are a favored and useful tool designed "to prevent a party before trial from encumbering the record with irrelevant, immaterial or cumulative matters. Such a motion enables a court to rule in advance on the admissibility of documentary or testimonial evidence and thus expedite and render efficient a subsequent trial.' " *Weeks Dredging & Contracting, Inc. v. United States,* 11 Cl.Ct. 37, 45 (1986) (citation omitted).

Defendant moves for the court to grant its motion *in limine* and bar plaintiffs from collaterally attacking the government action that allegedly effected a taking in this case: the Corps'. decision to invalidate the 1988 wetlands delineation of the Double Diamond Ranch and redelineate the property in 1991. Defendant contends that under the well-settled law of this court and the Federal Circuit, plaintiffs cannot challenge the validity of the Corps' redelineation of the Double Diamond Ranch in the context of this regulatory takings action. *See* Def. Mot. *In Limine* [9] at 11–13 (discussing, *inter alia, Florida Rock Indus., Inc. v. United States,* 791 F.2d 893 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987); *Tabb Lakes, Ltd. v. United States,* 10 F.3d 796 (Fed.Cir.1993); *Rith Energy, Inc. v. United States,* 247 F.3d 1355, 1365–66 (Fed.Cir.), *reh'g denied,* 270 F.3d 1347, 1352–53 (Fed. Cir.2001), *cert. denied,* 536 U.S. 958, 122

---

**9.** Def. Mot. *In Limine* refers to defendant's corrected motion *in limine* to bar plaintiffs from challenging the validity of the government action

that allegedly effected a taking in this case filed February 12, 2003.

S.Ct. 2660, 153 L.Ed.2d 835 (2002)). Specifically, defendant asks the court to:

> [B]ar the introduction of any and all evidence, whether written or oral, including, but not limited to, expert reports and expert testimony, that challenges the propriety of the Corps' delineation, the technical accuracy of the Corps' redelineation, any of the factual conclusions in the Corps' letter dated October 10, 1990, rescinding the 1988 delineation, or contained in the Corps['] 1991 delineation reports, associated data sheets and delineation map, or the technical accuracy and propriety of the Corps map identifying other waters of the United States dated September 13, 1994. Finally, defendant asks the Court to bar Plaintiffs from referring to any such evidence in their oral and written submissions to the court.

Def. Mot. *In Limine* at 1.

Plaintiffs contend that defendant's motion rests on an issue not before the court, because "[p]laintiffs ... concede the validity of both the 1988 and the 1991 delineations as required for Tucker Act jurisdiction over a takings claim and thus the entire premise for defendant' motion is groundless." Pl. Mot. *In Limine* Opp.[10] at 7. Plaintiffs further contend that because the touchstone of the takings analysis is fairness, the government's reasons for revocations are relevant to the question of who should bear the burden of paying for the costs imposed by the government's decision to redelineate.

**B.  Analysis**

■ Precedent binding on this court makes it clear that the court must presume that the government's actions giving rise to the alleged taking are both authorized and legally correct. In *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 905 (Fed.Cir. 1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987) the court made clear that "the alleged taker ha[s] a right, in the Claims Court, to have the claim assessed on the basis that its regulatory action was valid and correct in all respects." The court stated that a "Tucker Act suit in the Claims Court is not ... available to recover damages for unauthorized acts of government officials." *Id.* at 898 (citing *Armijo v. United States*, 663 F.2d 90, 229 Ct.Cl. 34 (1981); *NBH Land Co. v. United States*, 576 F.2d 317, 217 Ct.Cl. 41 (1978)). This is so because a "'Tucker Act suit does not lie for an executive taking not authorized by Congress, expressly or by implication.'" *Tabb Lakes*, 10 F.3d at 802 (further citation omitted). *See also Del-Rio Drilling Programs Inc. v. United States*, 146 F.3d 1358, 1362 (1998) (stating that "[a] compensable taking arises only if the government action is authorized ... [t]he principle underlying this rule is that when a government official engages in ultra vires conduct, the official 'will not, in any legal or constitutional sense, represent the United States, and what he does or omits to do, without the authority of Congress'") (citation omitted). The appropriate venue to challenge the unlawfulness or invalidity of a government action is in a United States district court under the Administrative Procedure Act, 5 U.S.C. § 702. *See Florida Rock*, 791 F.2d at 898.

■ Thus, plaintiffs must concede the validity of the government action which is the basis of the takings claim to bring suit under the Tucker Act. *Tabb Lakes*, 10 F.3d at 802–03 (citing 28 U.S.C. § 1491; *Florida Rock*, 791 F.2d at 899). *See also Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1366 (Fed. Cir.), *reh'g denied*, 270 F.3d 1347 (Fed.Cir. 2001), *cert. denied* 536 U.S. 958, 122 S.Ct. 2660, 153 L.Ed.2d 835 (2002) (stating that "Rith is thus required to litigate its takings claim on the assumption that the administrative action was both authorized and lawful"); *Appolo Fuels, Inc. v. United States*, 54 Fed. Cl. 717, 738–39 (2002); *El-Shifa Pharmaceutical Indus. Co. v. United States*, 55 Fed.Cl. 751, 766–67 (2003) (stating that "[i]t is a cardinal rule of Takings jurisprudence that the legitimacy or authority of the Government's action must be conceded in takings proceedings before this Court").

■ This being said, plaintiffs in this case do concede both the validity and the lawful-

---

10.  Pl. Mot. *In Limine* Opp. refers to the opposition of plaintiffs, Don Roger Norman *et al.,* to defendant's motion *in limine* filed March 7, 2003.

ness of the government's actions which constitute the basis of their takings claim in this case. Plaintiffs expressly state: "Plaintiffs, however, concede the validity for both the 1988 and the 1991 delineations as required for Tucker Act jurisdiction over a takings claim and thus the entire premise for defendant's motion is groundless." Pl. Mot. *In Limine* Opp. at 7. Also, at oral argument, counsel for plaintiffs conceded both that the government's actions were authorized and lawful. *See* Transcript of March 28, 2003 oral argument filed April 2, 2003, at 74; 75; 81.

Because plaintiffs have expressly conceded both the lawfulness and validity of the government's actions which form the basis of the takings claim in this matter, as they are so required pursuant to the controlling precedent discussed above, this court sees no reason to explore the issue any further. The court, will, however, grant defendant's motion for partial summary judgment in part, *only insofar as* it seeks to prevent plaintiffs from challenging the validity and authorization of the government action in violation of *Florida Rock* and its progeny, as defendant is correct in that this court is not the appropriate venue to raise such arguments, a United States district court is.

Also before the court is, however, the question of whether the court should at all consider plaintiffs' evidence of the alleged impropriety/unfairness of the redelineation and factors underlying the motivation for redelineation under the analysis of *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).[11] As previously stated, defendant in this case seeks to prevent plaintiffs from presenting in future proceedings in this case any and all evidence pertaining to the fairness of the government's actions in this case.

In *Penn Central* the Supreme Court stated that in engaging in the essentially "ad hoc, factual inquiries" of what constitutes a taking for purposes of the Fifth Amendment, several factors that "have particular significance" include: (1) the economic impact of the regulation; (2) the extent to which the regulation interferes with reasonable investment-backed expectations; and (3) the character of the government action. *See Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. The court to some extent agrees with plaintiffs that what the government seeks to exclude may hinder the disclosure of all relevant aspects of the government's conduct and actions in this case, and some of this information *may* ultimately bear upon the question of whether plaintiffs are entitled to recovery on a Fifth Amendment takings theory.

The court declines to exclude the totality of plaintiffs' evidence regarding the history and the alleged unfairness of the government's actions because: (1) this is a case of first impression and therefore the court has not yet determined (and is unable to determine at this juncture absent specifics on the type of testimony to be presented and for what purpose) whether the evidence which plaintiffs may seek to present at trial and/or in future proceedings before this court could appropriately be considered under any or all of the listed *Penn Central* factors; (2) the Supreme Court expressly stated in *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659 that the Court "has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons;" (3) although, as discussed in detail above, plaintiffs are prohibited from presenting evidence *for the purpose of* establishing the illegality and/or invalidity of the government actions in this case, the court does not wish to constrain plaintiffs' ability to shape their lawsuit, as the court believes to do so would severely hinder counsel for plaintiffs' ability to present plaintiffs' case; (4) to invoke such a broad sweep of exclusion of evidence as defendant wishes this court to order could severely hinder the court's ability to hear the totality of the relevant factual history underlying this matter; and (5) because the court

---

**11.** Despite some references in plaintiffs' most recent filings before this court referring to the taking in this case as "physical" in nature, the court will, for the time being, assume that plaintiffs' taking claim will ultimately be analyzed under the test for a regulatory taking set forth in *Penn Central*.

itself is aware of the extreme complexity and novelty of the factual and legal issues posed within this case and is itself aware that the facts of this case do not necessarily square neatly within the framework of existing precedent, the court is of the opinion that at least some of the evidence plaintiffs will likely seek to present at trial may be directly relevant to the ultimate resolution of this matter.

Accordingly, defendant's corrected motion *in limine* to bar plaintiffs from challenging the validity of the government action that allegedly effected a taking in this case filed February 12, 2003 is denied, except insofar as it seeks to exclude plaintiffs from challenging the validity or authorization of the government's actions upon which plaintiffs' taking claim is based. Plaintiffs are, however, cautioned that the court anticipates and indeed will require, that the testimony and evidence presented by plaintiffs in this regard be clearly relevant to the issues at hand. Further, the court does note that it is within the purview of this court to order the exclusion/omission of any testimony at trial which it deems to be irrelevant.

### CONCLUSION

For the following reasons, it is hereby **ORDERED** as follows:

(1) Plaintiffs' third claim for relief (in the alternative), illegal exaction, presented in their amended complaint filed March 27, 2002 is **DISMISSED** for lack of subject matter jurisdiction pursuant to 12(h)(3) by observation of the court;

(2) In view of this dismissal, defendant's motion for partial summary judgment and corrected memorandum in support of motion for partial summary judgment filed February 12, 2003 is **DENIED** as moot;

(3) Plaintiffs' cross-motion for partial summary judgment is **DENIED** as moot;

(4) Defendant's corrected motion *in limine* to bar plaintiffs from challenging the validity of the government action that allegedly effected a taking in this case, filed February 12, 2003, is **GRANTED** in part, insofar as it seeks to prevent plaintiffs from directly chal-

lenging the validity and authorization of the government's actions which form the basis of plaintiffs' Fifth Amendment taking claim in this matter, and is otherwise expressly **DENIED**; and

(5) **TRIAL** in this matter is hereby **SCHEDULED** for **December 1 through 12, 2003** at the United States Court of Federal Claims in Washington, D.C. The time and courtroom will be subsequently announced.