# United States Court of Appeals for the Federal Circuit

05-5039

DON ROGER NORMAN,
ROGER WILLIAM NORMAN,
and
SOUTH MEADOWS
PROPERTIES LIMITED PARTNERSHIP,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

Roger J. Marzulla, Marzulla and Marzulla, of Washington, DC, argued for plaintiffs-appellants.  With him on the brief was Nancie G. Marzulla.

John L. Smeltzer, Attorney, Appellate Section, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee.  With him on the brief were Kelly A. Johnson, Acting Assistant Attorney General, and Katherine J. Barton, Attorney.

Appealed from:  United States Court of Federal Claims

Judge Lynn J. Bush

# United States Court of Appeals for the Federal Circuit

05-5039

DON ROGER NORMAN,
ROGER WILLIAM NORMAN,
and
SOUTH MEADOWS
PROPERTIES LIMITED PARTNERSHIP,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:   November 18, 2005

_____

Before MICHEL, <u>Chief Judge</u>, BRYSON, and GAJARSA, <u>Circuit Judges</u>.

GAJARSA, <u>Circuit Judge</u>.

Don Norman, Roger Norman, and South Meadows Properties (collectively "appellants" or "the Normans") appeal two decisions of the United States Court of Federal Claims.  The first, issued April 17, 2003, dismissed the Normans' illegal exaction claim for lack of jurisdiction.  <u>Norman v. United States</u>, 56 Fed. Cl. 255 (2003) ("<u>Norman I</u>"). The second, issued December 10, 2004, dismissed, after a trial on the merits, the Normans' claim for just compensation under the Fifth Amendment.  <u>Norman v. United States</u>, 63 Fed. Cl. 231 (2004) ("<u>Norman II</u>").  The Court of Federal Claims

issued final judgment on December 14, 2004, and appellants timely filed a notice of appeal on January 5, 2005. For the reasons set forth below, we affirm.

## I.     BACKGROUND

The opinion of the Court of Federal Claims described the facts of this case in exhaustive detail. See Norman II, 63 Fed. Cl. at 234-43. As the trial judge stated, "[t]he background of this case spans over a decade of land acquisitions, purchases, sales, development plans, permit applications and issuances, with ever-changing persons, parties, companies, partnerships and entities involved." Id. at 233. We refer to the trial court's findings of fact, which appellants do not challenge, and set forth here only those facts that are necessary for the resolution of the appeal.

The Normans are real estate developers who, in the late 1980s, planned to develop commercial and industrial office space in Reno, Nevada, on a 2425-acre property previously used for ranching and agricultural activities (the "Ranch"). See id. at 234. In 1986, a company called Southmark Corporation purchased the Ranch, intending to develop it for commercial and residential uses. Southmark prepared a "master plan" for the development of the property and submitted it to the Reno City Council for approval. On January 30, 1987, the city council "conditionally approved" the master plan, identifying 41 conditions that the developer was required to satisfy before final approval would issue. One of those conditions required the developer to submit to the council "plans approved by the United States Army Corps of Engineers . . . delineating wetlands or any other lands the development of which were subject to the issuance of federal permits." Id.

In June of 1988, the Army Corps of Engineers (the "Corps") sent a team of wetlands experts to "conduct field work necessary to prepare a final wetlands delineation." Norman II, 63 Fed. Cl. at 235. In the months before that team arrived, the Normans became interested in purchasing a 470-acre commercial portion of the Ranch for development as an industrial park, "per the Master Plan" prepared by Southmark. Id. The Normans "were unwilling, however, to purchase the 470-acre commercial portion until the Corps completed a final wetlands delineation of the property." Id.

On September 12, 1988, the Corps issued a delineation (the "1988 Delineation"), prepared pursuant to the 1987 version of the Corps' Wetlands Delineation Manual. The 1988 Delineation identified 28 acres of jurisdictional wetlands on the Ranch property, of which 17 acres were located on the 470-acre parcel desired by the Normans. Following completion of the delineation, the Normans acquired the property. Id. At the same time, Robert Helms purchased the 1800-acre "residential" portion of the Ranch. The Normans and Helms then entered into an agreement whereby they agreed to develop their properties consistently with Southmark's Master Plan. The parties do not dispute that the Normans relied upon the 1988 Delineation in purchasing the 470-acre plot, or that their reliance was reasonable.

After the 1988 Delineation became public, however, a "storm of controversy" erupted, as a variety of concerned entities criticized the delineation. Id. at 237. The Corps then "revoked the 1988 wetlands delineation and conducted a new delineation under the 1989 version of the Corps' Wetlands Delineation Manual" (the "1991 Delineation"). Id. The new delineation effort began in April of 1991 and ended in October of 1991.

The 1991 Delineation substantially increased the acreage of jurisdictional wetlands on the subject property, identifying 230 acres of such wetlands. Of the 230 wetland acres, 87 acres were on the "commercial" portion of the parcel owned by the Normans. This increased the wetlands acreage by 70 acres. See Norman II, 63 Fed. Cl. at 237.

The revocation of the 1988 Delineation and the issuance of the subsequent 1991 Delineation lie at the heart of appellants' takings claims. The 1991 Delineation allegedly "forced" the owners of the Ranch property to revise their master development plan to account for the newly non-developable acreage. Id. at 238. In 1994, following creation of a new development plan that provided for development in three phases, the Normans began purchasing smaller properties adjacent to their 470-acre parcel. Later that year, Helms declared bankruptcy, and they purchased his 1800-acre parcel from his bankruptcy estate. The Normans then petitioned the City of Reno to re-annex that 1800 acres to the rest of the Ranch property (which had been de-annexed during Helms' ownership) and sought a master plan amendment to permit the 1800-acre parcel to constitute Phase III of their development plan. The city granted conditional approval in 1995. As of that date, plaintiffs owned approximately 2280 acres of property intended for development in the three-phase master plan. See id. at 238-39.

05-5039                                                    4

In 1995, appellants applied to the Corps for a permit under section 404 of the Clean Water Act[1] (a "404 Permit") enabling them to impact 15 acres of jurisdictional wetlands and other waters of the United States. As mitigation for the proposed impact, "plaintiffs proposed to create additional wetlands to ensure no net loss of wetlands functions and values." Norman II, 63 Fed. Cl. at 239. The Corps accepted the proposal and issued the permit.

In 1998, appellants submitted another 404 Permit application, this time seeking permission to impact wetlands throughout the 2280-acre development site. See id. at 239. The Corps responded that because appellants' proposed actions "would result in significant environmental impacts," the Corps would have to prepare an Environmental Impact Statement in compliance with the National Environmental Policy Act of 1969, unless appellants provided "a mitigation plan which clearly reduced the project impacts to a less than significant level." Id. The Corps also provided a "modified development alternative," suggesting a development plan with less significant environmental impacts. Id.

In July of 1999, appellants submitted a revised mitigation proposal that was, according to the trial court's findings of fact, "a result of a negotiations process between the Corps and plaintiffs," in which "the parties discussed which areas of property on the 2280-acre Development could be utilized as mitigation wetlands." Id. at 239. The

---

[1] Section 404 of the Clean Water Act, codified at 33 U.S.C. § 1344, establishes a program for the regulation of fill activities involving waters of the United States. The "basic premise of the program is that no discharge of dredged or fill material" into waters of the United States is "permitted if a practicable alternative exists that is less damaging" to the environment. Environmental Protection Agency, Section 404 of the Clean Water Act: An Overview, http://www.epa.gov/owow/wetlands/facts/fact10.html (last visited November 4, 2005).

resulting plan contemplated that "the areas designated . . . for storm drainage could sufficiently serve as mitigation wetlands due to the hydrology surrounding that area." Id. at 240. Under the modified development plan, a substantial portion of the mitigation wetlands would be on lands that would not otherwise have been developed in any case.

The Corps approved the proposal and, on August 31, 1999, issued the Normans a 404 Permit enabling them to proceed with their development plan (the "1999 Permit"). The 1999 Permit enabled appellants to fill approximately 60 acres of wetlands; in exchange, it required them to create or restore approximately 195 acres of wetlands as mitigation. In addition, it required them to "[r]ecord[] the formation of a Corps approved funding mechanism for the long term maintenance of the mitigation and preserve areas," and "[r]ecord[] deed restrictions maintaining all mitigation preservation areas as wetland preserves and wildlife habitat in perpetuity" (the "Deed of Restrictions"). Norman II, 63 Fed. Cl. at 240. In order to comply with the 1999 Permit's requirement that appellants provide a funding mechanism, appellants elected to transfer title in 220.85 acres[2] to South Meadows Association, a non-profit property owners' association initially controlled by the Normans. Id.

Prior to and following issuance of the 1999 Permit, appellants "continued to sell the developable parts of the 2280-acre Development to various independent third parties." Id. at 242. At the time the 1999 Permit actually issued, appellants owned only 716 acres of the original 2280-acre parcel.

---

[2] The Deed of Restrictions, as the trial court noted, imposed restrictions broader than those stated in the 1999 Permit itself. It called for the setting aside of a total of 235.14 acres of mitigation wetlands, while the Permit required only 195. Appellants arrive at the total of 220.85 acres they allege to have been taken by reading the Permit and the Deed together. See Norman II, 63 Fed. Cl. at 241.

The Normans filed the first lawsuit in this matter in 1995, raising breach of contract and takings claims. The subsequent history of the litigation is lengthy and is recited in detail in Norman II, 63 Fed. Cl. at 242-43. For our purposes here, the directly relevant trial court actions occurred beginning in 2003. On April 17 of that year, the Court of Federal Claims issued an opinion dismissing appellants' illegal exaction claim—added in an amended complaint filed in 2001—for lack of jurisdiction. On November 20, 2003, two weeks before trial was scheduled to begin, appellants filed a motion to retroactively amend their complaint a second time to change the number of acres allegedly taken to the current 220.85. See Norman II, 63 Fed. Cl. at 243. The trial court granted that motion on the first day of trial. Trial was held in December of 2003. Following the conclusion of trial, appellants filed their second amended complaint, subsequent to which the government filed its answer.

Following post-trial briefing, the Court of Federal Claims issued an opinion and order denying all of appellants' takings claims and ordering the clerk of court to enter judgment against appellants and dismiss their amended complaint with prejudice. The clerk entered final judgment, and appellants timely filed their notice of appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## II.    DISCUSSION

In their appeal, the Normans challenge the trial court's rulings on both their takings claims and their illegal exaction claim. This court reviews the trial court's findings of facts under the standard of "clear error." Hendler v. United States, 175 F.3d 1374, 1378 (Fed. Cir. 1999). We review the trial court's conclusions of law, including questions involving jurisdiction, de novo. See McDonnell Douglas Corp. v. United

States, 323 F.3d 1006, 1012 (Fed. Cir. 2003); Casa de Cambio Comdiv v. United States, 291 F.3d 1356, 1358 (Fed. Cir. 2002).

A.    Significance of the 1991 Delineation

We recognize at the outset a fundamental tension in the Normans' takings claim. The Normans place heavy weight on the revocation of the 1988 Delineation and subsequent issuance of the 1991 Delineation, arguing repeatedly that this single circumstance renders their takings claim "unique" and "sui generis."  They argue, essentially, that because they bought the 470-acre parcel in reliance upon the 1988 Delineation, the subsequent and less favorable re-delineation "culiminated in" a taking of the 220.85 acres set aside nearly a decade later in accordance with the 1999 Permit. At the same time, appellants expressly disclaim any allegation that the 1999 Permit, of itself, effected a taking: they state that they are "not ask[ing] this Court to hold that the government's routine requirement that a landowner set aside land as mitigation in exchange for a Section 404 wetland permit"—as occurred in the 1999 Permit—"violates the Just Compensation Clause."  The primary error they allege is that "by limiting its [takings] analysis solely to the permit, the trial court erred in excluding those very facts (the Corps' mistake and unlawful redelineation) that make this case uniquely a taking under the Fifth Amendment."

In other words, the Normans want this court to evaluate the entire sequence of events from 1988 through 1999 as a single transaction, in which the mitigation set-aside of 1999 followed ineluctably from the "unprecedented" 1991 Delineation.  If we conclude that those two events were, for purposes of takings analysis, distinct—that the events of 1991 did not, in appellants' words, "directly cause[] the Normans to lose 220.85 acres of

property in 1999"—then the bulk of their takings claims fail on that ground alone, because their challenge to the terms of the 1999 Permit is, according to their own argument, based solely upon the role of the 1991 Delineation in imposing those terms.

We find the Normans' argument unconvincing. The suggestion that Corps action in 1991 "directly" caused the Normans to lose 220.85 acres of property, most of which they did not own until 1994, strains the word "directly" well beyond its breaking point. The revocation and re-delineation that preceded the 1999 Permit by nearly a decade were but two of dozens of factual predicates leading up to the issuance of the 1999 Permit; others include the voluntary purchase, by appellants, of most of the land covered by that permit. That the decision to purchase that additional property may have been influenced, in small or large degree, by the events of 1988-1991 does not render it involuntary. The causal relationship between the revocation of the 1988 Delineation and the appellants' alleged loss is simply too attenuated to support the weight the Normans place upon it.

Because the Normans have disclaimed any challenge to the "routine" mitigation requirements of the 1999 Permit except insofar as they resulted from the "unique" 1991 Delineation, we believe this conclusion disposes of most of their takings claims without further analysis. In order to fully respond to the arguments appellants raise, however, we shall evaluate their claims in greater detail.

B.      Physical Takings Claim

In general, this court has analyzed takings claims arising from section 404 permit issues using the regulatory takings analysis set forth in Penn Central Transportation Co. v. New York, 438 U.S. 104 (1978). See, e.g., Forest Props., Inc. v. United States, 177

F.3d 1360, 1364 (Fed. Cir. 1999) (citing cases). Here, however, the Normans insist that, by its terms, the 1999 Permit effected a physical taking because it required that they transfer title to the 220.85 acres to a third party. It is axiomatic that "[w]here the government authorizes a physical occupation of property (or actually takes title) the Takings Clause generally requires compensation." Yee v. City of Escondido, 503 U.S. 519, 522 (1992). Here, although the Normans did transfer title in the wetland acreage to a nonprofit association, the record is clear that the title transfer was voluntary, and not a condition required under the 1999 Permit. According to the parties' joint stipulation, the Normans transferred title in the wetland acreage to the South Meadows Association "in order to comply with Condition 9.a" of the 1999 Permit, which required that the appellants "[r]ecord[] the formation of a Corps approved funding mechanism for the long term maintenance of the mitigation and preserve areas." Neither the 1999 Permit nor the Deed of Restrictions contained any requirement that title to the affected acreage be transferred; testimony offered at trial indicated that the funding mechanism requirement may be satisfied by several methods, and that although conveyance of title to a conservation group or nonprofit was one such method, the Corps did not require it.[3]

---

[3] Appellants do not seriously dispute this, relying instead on a passage in the trial court's opinion that could be read to suggest that the government stipulated that the conveyance was required. See Norman II, 63 Fed. Cl. at 247 ("[T]he parties stipulate that the combination of the 1999 Permit and the Deed of Restrictions required plaintiffs to . . . convey title to the wetlands mitigation acres to a non-profit property owners association."). It is clear from the trial court's opinion, however, that it in fact regarded the conveyance as voluntary. See id. ("[T]here was no requirement that the mitigation and preservation areas on the property be conveyed to a third party. The requirement was only that a funding mechanism be in place, but not necessarily that property be conveyed to a third party."). A review of the stipulation confirms that the government stipulated only that the conveyance in fact occurred "in order to comply with" the funding requirement—not that the conveyance itself was mandatory.

Neither did the Permit "exact" possession of the land. Appellants argue that "the Normans' loss of exclusive possession . . . constitutes a categorical taking under the Fifth Amendment," relying for that proposition on Nollan v. California Coastal Commission, 483 U.S. 825, 831-32 (1987). We note as an initial matter that is not at all clear that appellants have, in fact, lost "exclusive possession" of the land at issue. Nollan involved the use of a permit process to exact from a landowner an easement allowing public access across his land. No such physical intrusion—by government or the public—occurred here. Appellants have directed us to nothing in the 1999 Permit or in the Deed of Restrictions that deprives the owners of the land of the right to exclude others from the 220.85 acres. To the extent that appellants' claim of loss of possession is predicated on the transfer of title, we have already concluded that that transfer was voluntary and therefore not a proper basis on which to premise a takings claim.

Because we conclude that no physical invasion occurred here, the Normans' reliance on cases like United States v. Pueblo of Taos, 207 Ct. Cl. 53 (1975), and Yuba Natural Resources, Inc. v. United States, 821 F.2d 638 (Fed. Cir. 1987), is misplaced. Those cases involved government surveys and found takings where, for example, the United States misidentified a boundary line and took property actually belonging to a landowner and sold it to a third party. In those cases the survey error led to an actual transfer of property from its rightful owner to another, or to the outright physical invasion of the plaintiff's property by the government—events that would constitute classic takings regardless of the survey error. They stand for nothing more expansive than the obvious principle that the government cannot, by way of a simple survey error, take title

05-5039                                                     11

to or physically invade private properties in ways that would otherwise be takings, without payment of just compensation. They are not relevant here.

Even if the government's action could reasonably be characterized as a physical invasion, the Normans' claim for compensation would fail under the principles set forth by the Supreme Court in Nollan and in Dolan v. City of Tigard, 512 U.S. 374 (1994). Those cases involved efforts by government authorities to "exact" from landowners easements across their property in exchange for the issuance of otherwise legitimate development permits. See Nollan, 483 U.S. at 829; Dolan, 512 U.S. at 377. The Supreme Court framed the question at issue as whether, "given . . . that requiring uncompensated conveyance of the easement outright would violate the Fourteenth Amendment," requiring it "to be conveyed as a condition for issuing a land-use permit alters the outcome." Nollan, 483 U.S. at 834. The Court held that the permit issue did not alter the outcome. Drawing on existing precedent in the land-use regulation area, the Court stated the general rule that a land-use regulation "does not effect a taking if it substantially advances legitimate state interests and does not deny an owner economically viable use of his land." Id. It further provided that in order to avoid effecting a taking, there must be a "nexus" between the condition imposed and the "original purpose" of the regulation at issue. Id. at 837; see also Dolan, 512 U.S. at 386 (phrasing the issue as "whether [an] essential nexus exists between the legitimate state interest and the permit condition exacted" by the government) (internal quotations omitted). The condition must be "related both in nature and extent to the impact of the proposed development." Dolan, 512 U.S. at 391.

Even if the nexus requirement of the <u>Nollan</u> and <u>Dolan</u> line of exaction cases were applicable here—and we think it clear that it is not—we would agree with the trial court's conclusion that an appropriate nexus exists between the set-aside of the 220.85 acres and the regulatory purpose. In the words of the trial court, "[t]he public interest served by requiring the preservation of wetlands in exchange for the filling and dredging of other [wet]lands relates directly to the condition imposed. There is no disconnect." <u>Norman II</u>, 63 Fed. Cl. at 251.

C.     Categorical Takings Claim

A "categorical" taking is a regulatory taking in which government action deprives the landowner of all beneficial use of his property, such that the government action is the functional equivalent of a physical invasion. <u>See</u> <u>Lucas v. S.C. Coastal Council</u>, 505 U.S. 1003 (1992). The Court of Federal Claims concluded that "there has been no deprivation of all economically viable use" of the 2280-acre parcel as a whole "by virtue of the alleged taking of 220.85 acres of wetlands," and that even if "there was absolutely no use" remaining for those acres, "the percentage decrease in viable use" would be insufficient to constitute a categorical taking. <u>Norman II</u>, 63 Fed. Cl. at 261.

Assuming, <u>arguendo</u>, that the Normans intend to challenge the terms of the 1999 Permit despite their disavowal of such intent, the question here is whether the 1999 Permit in fact effected a deprivation of all beneficial use. The case law on categorical takings, and indeed <u>Lucas</u> itself, is clear that only a complete deprivation will constitute a categorical or "per se" taking. <u>See, e.g.</u>, <u>Lucas</u>, 505 U.S. at 1019 n.8; <u>Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency</u>, 535 U.S. 302, 324, 330 (describing categorical taking as an "extraordinary circumstance" and a "narrow exception" to

05-5039                                           13

regulatory takings principles). Appellants' lumping together of their physical and categorical takings claims obscures, perhaps willfully, the critical difference between those claims: a physical taking of any portion of private property will ordinarily result in compensation, while a regulatory taking becomes "categorical," and therefore requires compensation, only if the owner is deprived of all beneficial use of the "parcel as a whole." If the government action does not deprive the owner of all beneficial use of the entire relevant parcel, then no categorical taking can be shown. See Tahoe-Sierra, 535 U.S. at 330-31; Appolo Fuels, Inc. v. United States, 381 F.3d 1338, 1346 (Fed. Cir. 2004).

Here, the trial court identified the "parcel as a whole" as "the 2280-acre Development," comprising the properties designated for development in Phases I, II, and III of the development plan, exclusive of property conveyed to the state for rights-of-way. Norman II, 63 Fed. Cl. at 259-61. Its analysis is consistent with our precedent in this area, which states that the critical issue is "the economic expectations of the claimant with regard to the property," and that "[w]here the developer treats legally separate parcels as a single economic unit, together they may constitute the relevant parcel." Forest Props., 177 F.3d at 1365 (citing cases). Here, the record is clear that the appellants themselves regarded the 2280-acre parcel as a single economic unit.[4] In any case, appellants have not challenged the trial court's analysis of the parcel as a whole.[5] Without an effective challenge to the trial court's identification of the parcel as a

---

[4]    In this regard, we note that appellants' own permit application related to the entire 2280-acre parcel, and not to any subdivision thereof.

[5]    Appellants devote a few cursory sentences to disputing the trial court's parcel as a whole analysis, but only in their reply brief. Arguments raised for the first time in a reply brief are not properly before this court. See, e.g., Novosteel SA v. United

whole, appellants cannot dispute that court's conclusion that the facts here do not sustain a categorical takings claim.

###### D.    Regulatory Takings Claim

Having correctly found that there was no categorical taking of plaintiffs' property, the trial court moved on to "weigh the three factors of the <u>Penn Central</u> ad hoc analysis to determine whether a regulatory taking" occurred. <u>Norman II</u>, 63 Fed. Cl. at 261.  That analysis requires the court to "balance (1) the extent to which the regulation has interfered with . . . reasonable investment-backed expectations; (2) the economic impact of the regulation on the claimant; and (3) the character of the governmental action at issue." <u>Id.</u> (citing <u>Penn Cent. Transp. Co</u>., 438 U.S. at 124).

After undertaking a meticulous analysis of the <u>Penn Central</u> factors as applied to the facts at bar, the trial court concluded that appellants had "reasonable investment-backed expectations" with respect to only the four-acre parcel described as "WL 17B," which appellants purchased in 1989 but which was first delineated as wetlands in the 1991 Delineation. <u>See</u> <u>id.</u> at 267-68.  The trial court then concluded that the economic impact factor weighed against a finding of a taking, because the 1999 Permit actually increased the economic value of the parcel as a whole by "allow[ing] plaintiffs to fill valuable commercial property and develop that property in exchange for setting aside

---

States, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("[a] party waives arguments based on what appears in its brief.").  Although this practice is "not governed by a rigid rule," we will adhere to it except "where circumstances indicate that it would result in basically unfair procedure." Becton Dickinson & Co. v. C.R. Bard, Inc., 922 F.2d 792, 800 (Fed. Cir. 1990).  No such circumstances are presented here.  Even if appellants' arguments appeared in their primary brief, we would find them unconvincing, as they amount to little more than generalized disagreement with the trial court's analysis.  Appellants make no effort to provide a sustained and coherent argument for a different parcel as a whole.

05-5039                                              15

other, less valuable property for mitigation." Id. at 278. Finally, the trial court analyzed the character of the government action, concluding that the issuance of the 1999 Permit served a "legitimate public welfare obligation"; that appellants were treated fairly by the Corps and that the Permit was itself the product of negotiations between the Corps and appellants; and that appellants were not singled out for disparate treatment. See id. at 282-86. Weighing all these factors in light of the facts of the case, the trial court concluded that "no regulatory taking of property . . . occurred," because the Corps' actions "simply did not unduly burden plaintiffs." Id. at 287.

The Normans challenge very little of the trial court's Penn Central analysis. Their briefs do not even mention the trial court's extensive discussion of the "character of the governmental action" factor. With respect to the other two factors, their rather cursory arguments amount to little more than a reiteration of the claim, rejected above, that the critical causative element at issue here was not the 1999 Permit but the events of 1988-1991. Appellants argue, for example—albeit briefly—that the trial court erred in failing to measure economic impact as of the time of the 1988 Delineation. This position is illogical. The Normans cannot explain why the trial court should have measured economic impact as of a time when they did not own the great majority of the property allegedly taken.

The same is true regarding reasonable investment-backed expectations. The Normans argue that their expectation interest should have been measured as of 1988, when they purchased the initial 470-acre parcel. We note first that the trial court did, in fact, measure appellants' expectations with respect to the 470 acres as of the date they purchased that land, and found that the Normans had reasonable investment-backed

05-5039                                          16

expectations in a few of those acres.  See Norman II, 63 Fed. Cl. at 266-70.  Appellants do not explain on what theory we should measure their expectation as of 1988 with respect to acreage they did not own until 1994.  It is axiomatic that "'a reasonable investment-backed expectation' must be more than 'a unilateral expectation or an abstract need.'"  Ruckelshaus v. Monsanto, 467 U.S. 986, 1005-06 (1984) (quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980)).  As of 1988, the Normans simply could not have had any investment-backed expectation in property in which they had not yet invested.

In addition, we note that although a takings claim "is not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction," Palazzolo v. Rhode Island, 533 U.S. 606, 630 (2001), it is particularly difficult to establish a reasonable investment-backed expectation in circumstances like these. "The purpose of consideration of plaintiffs' investment-backed expectations," we have held, "is to limit recoveries to property owners who can demonstrate that they 'bought their property in reliance on a state of affairs that did not include the challenged regulatory regime.'"  Cienega Gardens v. United States, 331 F.3d 1319, 1345-46 (Fed. Cir. 2003) (quoting Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1177 (Fed. Cir. 1994)). Here, the Normans were not only constructively but also actually aware of the applicable wetland restrictions, and purchased most of the land with full knowledge that portions of it were not subject to development.  They could not have made those purchases in reliance on a "state of affairs" that did not include those restrictions.  We conclude that the trial court correctly found that the appellants had reasonable

investment-backed expectations only with respect to the four-acre parcel known as "WL 17B."

The trial court found that the Normans reasonably relied on the 1988 Delineation when purchasing their original 470-acre parcel. In that delineation, the Corps designated only 17 acres of the 470-acre parcel as wetlands. The 1991 Delineation identified an additional 70 acres of that parcel as wetlands. Although as of the time they purchased the 470-acre parcel, the Normans had reasonable investment-backed expectations that they would be able to develop those 70 acres, the effect of the 1991 Delineation was considerably mitigated by the 1999 Permit and related Deed of Restrictions, which resulted in the transfer of 220.85 acres to the South Meadows Association but also resulted in the Normans gaining the right to develop all but a few of the 70 acres designated as wetlands in 1991. To be sure, in order to obtain the right to develop those acres, appellants had to agree to set aside additional acreage as mitigation wetlands. The trial court found, however, that almost all of the property that either had been designated as wetlands in the original 1988 Delineation (of which the Normans were fully aware when they purchased the 470-acre parcel), or was outside the 470-acre parcel (and thus was purchased by the Normans only after it had already been designated as wetlands in 1991), or was never intended for development (because it was intended to be used for storm run-off and flood control). Thus, the trial court found that of the 220.85 acres set aside for mitigation, only 4.07 acres constituted property that the appellants intended and reasonably expected to be able to develop.

The Normans argue that they had reasonable investment-backed expectations with respect to the entire 220.85 acres that were set aside as mitigation. They do not,

however, specifically challenge the trial court's characterization of each of the components of the 220.85 acres. Neither do they suggest any way in which the trial court erred in concluding that the 1991 Delineation, as applied to the 470-acre parcel, had any lingering effects other than with regard to the 4.07-acre parcel as to which the trial court found that the appellants had a reasonable investment-backed expectation. Because the trial court's finding as to the appellants' reasonable investment-backed expectations with regard to the 470-acre parcel has not been shown to be erroneous, we uphold the trial court's finding that the Normans' reasonable investment-backed expectations were limited to the 4.07-acre plot.

In light of the trial court's finding with respect to reasonable investment-backed expectations, the Normans' challenge to the court's regulatory takings analysis is unpersuasive. The appellants claim that the trial court's implementation of Penn Central's inherently fact-specific, ad hoc inquiry was, for lack of a better phrase, insufficiently ad hoc. Decrying the careful three-factored analysis of the trial court as inappropriately employing a "rigid set formula," they argue that in a properly fact-sensitive analysis, the "single fact" of the Corps' "illegal redelineation" should have been "dispositive of the takings issue," and argue that on several occasions the courts have allowed a single extraordinary fact to determine the entire takings question. In that regard, we note that on those occasions when this court and the Supreme Court have found a single factor dispositive of the takings issue, it has been the absence of that factor—not its presence—that proved dispositive. See, e.g., Monsanto, 467 U.S. at 1005 (finding that "the force of the [reasonable expectations factor] is so overwhelming . . . that it disposes of the taking question," where the plaintiff "could not have had a

reasonable investment-backed expectation"); Golden Pac. Bank Corp. v. United States, 15 F.3d 1066, 1074 (Fed. Cir. 1994) (concluding that the absence of reasonable investment-backed expectations was dispositive of a takings claim).[6]  None of the authorities cited by appellants identifies a compensable taking in a circumstance like this one, in which reasonable investment-backed expectations existed with respect to a tiny fraction of the allegedly taken property, and the other two Penn Central factors— largely unchallenged here—were resolved decisively against the takings claim.

In short, the Normans have provided us no basis on which to reverse the trial court's conclusion that no taking occurred here.

E.      Illegal Exaction Claim

On April 17, 2003, the Court of Federal Claims issued an opinion and order dismissing appellants' illegal exaction claim for lack of jurisdiction.  See Norman I, 56 Fed. Cl. at 266-67, 270.  Appellants' amended complaint claimed, as an alternative to their takings claim, that the 1991 Delineation effected an "exaction" of their property in violation of Public Law 102-104, which "forbade the expenditure of any funds by the Corps to delineate wetlands under the 1989 Federal Manual."  Id. at 266.

We note at the outset that both appellants' amended complaint and their briefs appear to conflate two distinct types of "exactions."  Paragraph 40 of the complaint alleges that "[b]y reason of the 1999 permit requirement . . . plaintiffs were required to dedicate for public use in perpetuity 220.85 acres of plaintiffs' land in violation of Pub. L.

---

[6]      The Supreme Court's decision in Hodel v. Irving, 481 U.S. 704 (1987), is not to the contrary.  In that case, the Court clearly found that two of the three Penn Central factors—economic impact and character of the government's action—weighed in favor of just compensation, and that in light of the "extraordinary" nature of the government action, the absence of reasonable investment-backed expectations did not defeat the takings claim.  See Hodel, 481 U.S. at 714.

102-104 and the Fifth Amendment to the United States Constitution."  This sentence appears to allege the kind of "exaction" at issue in takings cases like Dolan and Nollan—where the government uses a permitting process to obtain from a landowner concessions which, if the government accomplished them directly, would constitute takings.  Although such claims are phrased, in part, in terms of "exactions," they are clearly Fifth Amendment takings claims.  These claims were not dismissed by the trial court's order of April 17, 2003, and are discussed in the sections on takings above.

Paragraph 41 of the amended complaint, however, appears to allege something different.  It reads, "[a]s a proximate result of the acts of Defendant United States, plaintiffs also have incurred substantial expenses," including approximately $2 million in service fees incurred in assisting the Corps with its delineation and $1 million in construction costs for mitigation projects.  The complaint describes these expenses as "illegal exactions."

An "illegal exaction," as that term is generally used, involves money that was "improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation."  Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007 (Ct. Cl. 1967).  The classic illegal exaction claim is a tax refund suit alleging that taxes have been improperly collected or withheld by the government.  See, e.g., City of Alexandria v. United States, 737 F.2d 1022, 1028 (Fed. Cir. 1984).  An illegal exaction involves a deprivation of property without due process of law, in violation of the Due Process Clause of the Fifth Amendment to the Constitution.  See, e.g., Casa de Cambio Comdiv, 291 F.3d at 1363.  The Court of Federal Claims ordinarily lacks jurisdiction over due process claims under the Tucker Act, 28 U.S.C. §1491, see Murray

v. United States, 817 F.2d 1580, 1582 (Fed. Cir. 1987), but has been held to have jurisdiction over illegal exaction claims "when the exaction is based upon an asserted statutory power." Aerolineas Argentinas v. United States, 77 F.3d 1564, 1573 (Fed. Cir. 1996); see also Eastport, 372 F.2d at 1008 (Court of Claims had jurisdiction over exaction "based upon a power supposedly conferred by a statute"). To invoke Tucker Act jurisdiction over an illegal exaction claim, a claimant must demonstrate that the statute or provision causing the exaction itself provides, either expressly or by "necessary implication," that "the remedy for its violation entails a return of money unlawfully exacted." Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1373 (Fed. Cir. 2000) (concluding that the Tucker Act provided jurisdiction over an illegal exaction claim based upon the Export Clause of the Constitution because the language of that clause "leads to the ineluctable conclusion that the clause provides a cause of action with a monetary remedy").

The Normans claim that the 1991 Delineation "exacted" from them their land, in contravention of Public Law 102-104, which prohibited the expenditure of public funds for delineations using the Corps' 1989 Wetland Delineation Manual. They claimed below that "funds were expended on delineation of [the disputed property] as late as October 30, 1991, when the Corps claims the 1991 delineation became final." Norman I, 56 Fed. Cl. at 265. Before this court, they argue that because the 1991 Delineation used the 1989 Manual and expended funds in doing so, and because the 1991 Delineation led "foreseeably and predictably" to "the loss of the 220.85 acres," that "exaction" occurred in violation of a federal statute and therefore came within the

subject matter jurisdiction of the Court of Federal Claims under <u>Casa de Cambio Comdiv</u> and similar cases.

The trial court rejected that argument, concluding that even if the 1991 Delineation violated Public Law 102-104, the Court of Federal Claims lacked jurisdiction over the supposed exaction because the land was not exacted "<u>due to</u> [a] misapplication of" the statute as required by <u>Aerolineas</u>, <u>Casa de Cambio Comdiv</u> and <u>Eastport</u>. <u>See</u> <u>Norman I</u>, 56 Fed. Cl. at 266 (emphasis original). The trial court ruled that "Public Law 102-104 was not the instrument through which plaintiffs' property was exacted[;] it was merely an appropriations act, and, as such, plaintiffs cannot maintain an illegal exaction claim based exclusively on violation of this act." <u>Id.</u>

Appellants argue that "it was precisely through the Corps' illegal 1991 re-delineation of the Normans' property . . . that the Corps gained jurisdiction over an additional 70 acres of wetland and, as the price of allowing the Normans to regain the use of that 70 acres, exacted from the Normans 220.85 acres of 'mitigation' lands." This is a reiteration of appellants' argument, rejected above, that the 1991 Delineation somehow itself effected the taking of the 220.85 acres set aside in the 1999 Permit. The facts simply do not support that contention. Appellants' assertion that "the loss of the 220.85 acres was the foreseeable and predictable result of redelineation under the 1989 manual," such that the 220.85 acres were "exacted <u>as a direct result of</u> the application of" Public Law 104-102, as required for Tucker Act jurisdiction over exaction claims, strains the meanings of the words "foreseeable," "predictable," and "directly" beyond all recognition. <u>See</u> <u>Casa de Cambio Comdiv v. United States</u>, 48 Fed. Cl. 137, 145 (2000), <u>aff'd</u>, 291 F.3d 1356 (Fed. Cir. 2002). As we concluded in rejecting

appellants' takings claims, the causal connection between the 1991 Delineation and the alleged exaction is simply too attenuated to bear the weight appellants place upon it.

This court has addressed this causal attenuation problem in exaction cases on several occasions. We have held, for example, that "a plaintiff has a claim for an illegal exaction only where the government [action] has direct and substantial impact on the plaintiff asserting the claim." Casa de Cambio Comdiv, 291 F.3d at 1364; see also Ont. Power Generation, Inc. v. United States, 369 F.3d 1298, 1303 (Fed. Cir. 2004) ("The government is considered to have illegally exacted money from a plaintiff only where the government's actions . . . have a direct and substantial impact on the plaintiff.") (internal quotations omitted). The Normans argue that the 1991 Delineation had a direct or substantial effect on them, but they cannot reasonably maintain that it directly caused the actual "exaction" alleged here, which resulted from the 1999 Permit. Although these cases involved somewhat different factual circumstances, they are sufficiently analogous to support our decision here.

Assuming arguendo that illegal exaction principles are ever applicable to actions against the United States for just compensation for an alleged taking of real property, we agree with the trial court that "misapplication of Public Law No. 02-104 did not directly result in an exaction . . . so as to satisfy the jurisdictional prerequisite for maintaining an illegal exaction claim" under the Tucker Act. Norman I, 53 Fed. Cl. at 266. In addition, we conclude that Public Law 102-104 does not, by its terms or by necessary implication, provide a cause of action with a monetary remedy for its violation. Cf. Cyprus Amax Coal, 205 F.3d at 1373 (concluding that the Tucker Act provided jurisdiction over an illegal exaction claim based upon the Export Clause of the

Constitution because the language of that clause "leads to the ineluctable conclusion that the clause provides a cause of action with a monetary remedy").  We affirm the trial court's order dismissing appellants' illegal exaction claim.

## CONCLUSION

For the reasons set forth in this opinion, we affirm the trial court's judgment in favor of the United States as to the Normans' takings claims and affirm the trial court's dismissal, for lack of jurisdiction, of the Normans' illegal exaction claim.

## <u>AFFIRMED</u>

No costs.