Wallach, Circuit Judge,
concurring-in-part and concurring-in-the-result.
“[Ejvery federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, even though the parties are prepared to concede it.” Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) (internal quotation marks and citation omitted). The same is true of a party’s standing under Article III of the Constitution. See Juidice v. Vail, 430 U.S. 327, 331, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (“Although raised by neither of the parties, we are first obliged to examine ... standing ..., as a matter of the case-or-controversy requirement associated with Article] III....” (citations omitted)). Because I believe that the majority, like the U.S. Court of Federal claims and both parties here, improperly bypasses examination of the threshold requirements of jurisdiction and constitutional standing, I write separately to express my views regarding the Court of Federal Claims’s jurisdiction and Starr International Company, Inc.’s (“Starr”) constitutional standing.
Discussion
I agree with the result of the majority opinion, I also agree with the majority’s thorough summary of the facts and, thus, provide only a brief summary for the necessary context here.
At the inception of what is now known as the Great Recession, American International Group, Inc. (“AIG”) was on the brink of bankruptcy. As a result, the United States (“Government”) approved an $85 billion dollar loan to AIG, accepting a 79,9% equity stake in AIG as collateral. Starr Int’l Co. v. United States (Starr VI), 121 Fed.Cl. 428, 430-31 (2015). Starr, one of the largest shareholders of AIG common stock, alleged that that the Government’s actions violated the Fifth Amendment of the Constitution as either an illegal exaction or a taking without just compensation. Id. at 430. Following several opinions and a thirty-seven day trial, the Court of Federal Claims entered final judgment, holding that the Government illegally exacted certain Starr shareholders’ property but awarding zero damages; and that the Government did not illegally exact other Starr shareholders’ property. See id. at 475.[1] Having found the Government liable for illegally exacting Starr’s property, the Court of Federal Claims *976 forewent consideration of. Starr’s taking claim. See id. at 472.
I Relieve that the Court of Federal Claims committed several errors regarding jurisdiction and standing, both as to Starr’s illegal exaction and taking claims. Although I agree with the majority’s conclusion that Starr lacks standing under Delaware law, Maj. Op. 988, I also believe that the majority’s failure to address the Court of Federal Claims’s errors fosters uncertainty because it bypasses an important jurisdictional question and elevates state law over constitutional standing requirements. Therefore, I first address jurisdiction and then standing.
I. Jurisdiction
“[A] federal court [generally must] satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case.” Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999). The Court of Federal Claims is no exception. See Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (en banc in relevant part).
As will be explained more fully below, the jurisdictional requirements for Starr’s illegal exaction claim and taking without just compensation claim differ in two key respects. First, Starr must allege a separate . money-mandating source of law to invoke Court of Federal Claims jurisdiction for its illegal exaction claim, even though it need not do so for its taking claim. Second, whether Starr’s claim should be evaluated as an illegal exaction or a taking depends upon whether the Government’s actions were authorized..
Therefore, I first articulate the'jurisdictional requirements of the Tucker Act, including the application of the money-mandating requirement to illegal exaction and taking claims. I then explain the Court of Federal Claims’s errors in finding jurisdiction. Next, I analyze- the statutory provision at issue on appeal, § 13(3) of the Federal Reserve Act, 12 U.S.C. § 343 (2008)[2] (“§ 13(3)”), to determine whether it is money-mandating and'what authorities it grants the Government. Finally, I apply that statutory analysis to the relevant facts to determine whether the Court of Federal Claims had jurisdiction to adjudicate Starr’s illegal exaction and taking claims.
A. Tucker Act Jurisdiction Over Illegal Exaction and Taking Claims
1. The Tucker Act’s Money-Mandating Requirement
“Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity, together with a claim falling within the terms of waiver.” United States v. White Mountain Apache Tribe, 537 U.S. 465, 472, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) (citations omitted).[3] “The terms of consent to be sued may not be inferred, but must be unequivocally expressed in order to define a court’s jurisdiction.” Id. (internal quotation marks, brackets, and *977 citations omitted); see United States v. Testan, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976) (“[I]n [the] Court of [Federal] Claims context, ... a waiver of the traditional sovereign immunity cannot be implied-but must be unequivocally expressed.” (emphasis added) (internal quotation marks and citations omitted)). “The Tucker Act contains such a waiver.” White Mountain, 537 U.S. at 472, 123 S.Ct. 1126 (citation omitted).
Pursuant to the Tucker Act, the Court of Federal Claims has jurisdiction “to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.” 28 U.S.C. § 1491(a)(1). The Tucker Act is “a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages.... [T]he Act merely confers jurisdiction upon [the Court of Federal Claims] whenever the substantive right exists.” Testan, 424 U.S. at 398, 96 S.Ct. 948 (emphasis added) (citation omitted). To pursue a substantive right pursuant to the Tucker Act, “a plaintiff must identify a separate source of substantive law that creates the right to money damages.... [T]hat source must be ‘money-mandating.’” Fisher, 402 F.3d at 1172 (citations omitted).
Although the waiver of sovereign immunity must be unequivocal, the money-mandating source of substantive law may be implied. In United States v. Mitchell, the Supreme Court held that the money-mandating source of substantive law may be implicit, reaffirming that a plaintiff “must demonstrate that the source of substantive law he relies upon can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.” 463 U.S. 206, 216-17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (emphasis added) (internal quotation marks, citation, and footnote omitted). Subsequently, the Supreme Court clarified the “fairly be interpreted” standard from Mitchell in White Mountain:
This fair interpretation rule demands a showing demonstrably lower than the standard for the initial waiver of sovereign immunity.... It is enough, then, that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be lightly inferred, a fair inference will do.
537 U.S. at 472-73, 123 S.Ct. 1126 (emphases added) (internal quotation marks and citations omitted).
2. The Application of the Tucker Act’s Money-Mandating Requirement to Illegal Exaction and Taking Claims
Both illegal exaction and taking claims derive from the Fifth Amendment. The Takings Clause of the Fifth Amendment inherently is money-mandating. See Jan’s Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1309 (Fed. Cir. 2008) (“It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction.”). However, we have not clearly explained whether the same is true for illegal exaction claims, see Starr VI, 121 Fed.Cl. at 464-65 (discussing apparent inconsistencies in our court’s application of the money-mandating requirement to illegal exaction claims), which “involve[ ]' a deprivation of property without due process of law, in violation of the Due Process Clause of the Fifth Amendment,” Norman v. United States, 429 F.3d 1081, 1095 (Fed. Cir. 2005).
*978 Although the Takings Clause provides that “private property [shall not] be taken for public use[] without just compensation,” the Due Process Clause does not similarly contemplate money damages. U.S. Const, amend. V (emphasis added); see In re United States, 463 F.3d 1328, 1335 n.5 (Fed. Cir. 2006) (“[Bjecause the Due Process Clause is not money-mandating, it may not provide the basis for jurisdiction under the Tucker Act.”); Murray v. United States, 817 F.2d 1580, 1583 (Fed. Cir. 1987) (“Although the Fifth Amendment’s [D]ue [PJrocess [C]lause provides that no person shall be deprived of property without due process of law, no language in the clause itself requires the payment of money damages for its violation.” (citation omitted)). This means that a party bringing an illegal exaction claim must identify a separate money-mandating source of substantive law entitling it to compensation. See White Mountain, 537 U.S. at 472, 123 S.Ct. 1126.
Indeed, the weight of our illegal exaction case law supports this conclusion. See, e.g., Norman, 429 F.3d at 1095 (“To invoke Tucker Act jurisdiction over an illegal exaction claim, a claimant must demonstrate that the statute or provision causing the exaction itself provides, either expressly or by necessary implication, that the remedy for its violation entails a return of money unlawfully exacted.” (internal quotation marks and citation omitted)); Cyprus Amax Coal Co. v. United States, 205 F.3d 1369, 1373 (Fed. Cir. 2000) (explaining that the appeal “turns on whether [the Export Clause, U.S. Const. art. I, § 9, cl. 2], when fairly interpreted, affords an independent cause of action for monetary remedies” and then finding jurisdiction because this interpretation “leads to the ineluctable conclusion that the clause provides a cause of action with a monetary remedy,” i.e., the “return of money unlawfully exacted”); Crocker v. United States, 125 F.3d 1475, 1476-77 (Fed. Cir. 1997) (per curiam) (“Because the Tucker Act does not provide any substantive rights, [the plaintiffl’s ability to bring a claim in the Court of Federal Claims turns on whether [the relevant statute] creates a substantive right for money damages in situations in which a penalty is improperly exacted.” (internal quotation marks and citations omitted)); Murray, 817 F.2d at 1583 (stating that the Claims Court did not have jurisdiction because “there is no language in the statute requiring compensation”). Moreover, if the money-mandating requirement did not apply to illegal exaction claims, then any Government violation of a constitutional provision, statute, or regulation could result in a claim for money damages against the Government. The law does not support such a result. See, e.g., Lane v. Pena, 518 U.S. 187, 196, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) (“It is plain that Congress is free to waive the Federal Government’s sovereign immunity against liability without waiving its immunity from monetary damages awards.”).
It is regrettable that the majority chooses to bypass this opportunity to clarify the law for future cases. Rather than forego this opportunity, I would find that illegal exaction claims are not inherently money-mandating and that, consequently, Starr was required to plead a separate money-mandating source of substantive law.
B. The Court of Federal Claims Erred in Its Jurisdictional Findings
In Fisher, this court held that “[w]hen a complaint is filed alleging a Tucker Act claim ..., the trial court at the outset shall determine, either in response to a motion by the Government or sua sponte (the court is always responsible for its own jurisdiction), whether the Constitutional provision, statute, or regulation is one that is money-mandating.” 402 F.3d at 1173 *979 (emphasis added) (citation omitted). We further explained that “the determination that the source is money-mandating shall be determinative both as to the question of the court’s jurisdiction and ... whether, on the merits, plaintiff has a money-mandating source on which to base his cause of action.” Id. “[T]he absence of a money-mandating source [is] fatal to the court’s jurisdiction under the Tucker Act,” requiring dismissal. Id.
Instead of determining whether a money-mandating statute is required for an illegal exaction claim at the outset, the Court of Federal Claims in the instant action deferred this determination for its final merits opinion. See Starr VI, 121 Fed.Cl. at 463-64 (noting that “there is one jurisdictional issue where the Court previously granted an inference in Starr’s favor, but which now requires further analysis”); Starr Int’l Co. v. United States (Starr II), 106 Fed.Cl. 50, 84 (2012) (“[T]he [c]ourt concludes that it is premature at this stage to rule decisively on the issue [of whether § 13(3) is money-mandating], let alone treat it as dispositive for purposes of Starr’s illegal exaction claim.”). The result of that analytical deferral was a thirty-seven day trial involving three Cabinet-level officials and five years of costly litigation. See Starr VI, 121 Fed.Cl. at 431-32.
In its ultimate post-trial jurisdictional findings, the Court of Federal Claims recognized that “taking claims stem from explicit money-mandating language in the Fifth Amendment, while illegal exaction claims do not.” Id. at 464.[4] The Court of Federal Claims then identified apparent inconsistencies in our precedent, stating that “some decisions have dispensed with the requirement for a money-mandating statute, seemingly embracing the concept that the Government should not escape responsibility for its unauthorized actions based on a jurisdictional loophole,” id., while “[o]ther decisions have espoused a slightly tighter standard, but one that is still broader than simply requiring a ‘money-mandating’ source of law,” id. at 465. The Court of Federal Claims found that Starr’s illegal exaction claims satisfied this broader jurisdictional threshold. Id. at 465-66.
In support, the Court of Federal Claims relied on language from oür decision in Norman, which states that a plaintiff “must demonstrate that the statute or provision causing the exaction [must] itself provide[ ], either expressly or by necessary implication, that the remedy for its violation entails a return of money unlawfully exacted.” 429 F.3d at 1095 (emphasis added) (internal quotation marks and citation omitted). On this basis, the Court of Federal Claims determined that
where the Government has imposed unlawful conditions in connection with an emergency loan under [§ ] 13(3) of the Federal Reserve Act, the Government should not be permitted to insulate itself from liability by arguing that [§ ] 13(3) is not “money-mandating.” If this were true, the Government could nationalize a private company, as it did to AIG, without fear of any claims or reprisals. Section 13(3) does not contain any express “money-mandating” language, but “by *980 necessary implication,” the statute should be read to allow the shareholders’ cause of action here. By taking 79.9 percent equity and voting control of AIG, the Government exacted the shareholders’ property interests. The two certified classes of AIG common stock shareholders were the parties directly affected by the Government’s unlawful action, and “by necessary implication,” they should be permitted to maintain them lawsuit.
Starr VI, 121 Fed.Cl. at 465 (emphases added). In addition to disregarding the en banc court’s instructions in Fisher to decide jurisdiction at the outset, the Court of Federal Claims’s reasoning suffers from five separate defects.
As an initial matter, when asked to reconsider whether § 13(3) is money-mandating, the Court of Federal Claims stated that it “must draw all reasonable inferences in favor of’ Starr and, thus, concluded that “at this stage Starr is entitled to the inference that [§ ] 13(3) is indeed money-mandating.” Starr Int'l Co. v. United States (Starr III), 107 Fed.Cl. 374, 378 (2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). However, Iqbal refers to factual, not legal, inferences. See Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (“A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.” (citation omitted)). Indeed, the Supreme Court has explained that allegations in a complaint must rest on a plausible legal theory to survive dismissal in the early stages of litigation. See, e.g., Fifth Third Bancorp v. Dudenhoeffer, — U.S. —, 134 S.Ct. 2459, 2471-72, 189 L.Ed.2d 457 (2014).
Second, the Court of Federal Claims never found that Starr met its burden of establishing jurisdiction by a preponderance of the evidence. See Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988) (“[The plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.” (citations omitted)). Without the requisite evidence, the Court of Federal Claims may not exercise jurisdiction. See M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327 (Fed. Cir. 2010).
Third, the Court of Federal Claims simply repeated one phrase from Norman as purported support for its erroneous interpretation of the money-mandating jurisdictional requirement. See Starr VI, 121 Fed.Cl. at 465, Had the Court of Federal Claims reviewed the array of available case law on Tucker Act jurisdiction, it must have found to the contrary. See, e.g., Cyprus, 205 F.3d at 1373; Crocker, 125 F.3d at 1476-77. In fact, in Norman, we affirmed the Court of Federal Claims’s dismissal of the illegal exaction claim for lack of jurisdiction because the statute at issue “d[id] not, by its terms or by necessary implication, provide a cause of action with a monetary remedy for its violation.” 429 F.3d at 1096 (emphases added). Norman — as well as the weight of our illegal exaction case law — requires plaintiffs to identify a money-mandating source of substantive law. See supra Section I.A.2.
Fourth, the Court of Federal Claims’s legal reasoning is based on that court’s own theory of equity. While acknowledging that § 13(3) “does not contain express money-mandating language,” the Court of Federal Claims simply repeated what the court believed “should” happen. Starr VI, 121 Fed.Cl. at 465 (internal quotation marks omitted). But what a law “should” do and what it does are often two different questions. See Lexmark Int’l, Inc. v. Static Control Components, Inc., — U.S. —, 134 S.Ct. 1377, 1388, 188 L.Ed.2d 392 *981 (2014) (“We do not ask whether in our judgment Congress should have authorized [the plaintiff’s suit, but whether Congress in fact did so.”). The test is whether the statute is “reasonably amenable to the reading that it mandates a right of recovery in damages,” White Mountain, 537 U.S. at 473, 123 S.Ct. 1126, and the Court of Federal Claims did not apply that test.
Fifth, the Court of Federal Claims incorrectly tethered its money-mandating determination to the facts of this case, see Starr VI, 121 Fed.Cl. at 463-64; Starr II, 106 Fed.Cl. at 84, but the correct inquiry is whether § 13(3) itself is money-mandating irrespective of the facts in a given dispute, see Fisher, 402 F.3d at 1173. As a result, the Court of Federal Claims incorrectly based its money-mandating finding on its post-facto determination that the Government took unauthorized action, see Starr VI, 121 Fed.Cl. at 465 (stating that “the Government could nationalize a private corporation, as it did to AIG, without fear of any claims or reprisals” (emphasis added)), when it should have focused on interpreting the language of the statute to determine Congressional intent. This inquiry neither requires nor permits such considerations.
Taken together, these reasons not only warrant, but require, reversal of the Court of Federal Claims’s finding of jurisdiction over Starr’s illegal exaction claim. Nevertheless, I continue by evaluating § 13(3) under the appropriate standard to determine its effect on Starr’s claims.
C. Statutory Interpretation of § 13(3) of the Federal Reserve Act
In this section, I discuss § 13(3) to determine its content and scope. Based on that analysis, I then evaluate in subsequent sections whether § 13(3) is money-mandating and whether it authorizes the taking of an equity stake (e.g., shares or stock warrants).
1. The Text of § 13(3) of the Federal Reserve Act
“[O]ur inquiry begins with the statutory text.” Bed-Roc Ltd. v. United States, 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004) (citations omitted). Section 13(3), in relevant part, provides:
In unusual and exigent circumstances, the Board of Governors of the Federal Reserve System [ (“BoG”) ], by the affirmative vote of not less than five members, may authorize any Federal [Reserve bank, during such periods as the said [BoG] may determine, at rates established in accordance with the provisions of [$] 357 of this title, to discount for any individual, partnership, or corporation, notes, drafts, and bills of exchange when such notes, drafts, and bills of exchange are indorsed or otherwise secured to the satisfaction of the Federal [R]eserve bank: Provided, That before discounting any such note, draft, or bill of exchange for an individual or a partnership or corporation the Federal [R]e-serve bank shall obtain evidence that such individual, partnership, or corporation is unable to secure adequate credit accommodations from other banking institutions. All such discounts for individuals, partnerships, or corporations shall be subject to such limitations, restrictions, and regulations as the [BoG] may prescribe.
12 U.S.C. § 343 (emphases added). The statute authorizes the Federal Reserve banks “to discount ,.. notes, drafts, and bills of exchange,” i.e., to make an interest bearing loan, to individuals, partnerships, and corporations. Id. However, this authority is subject to certain conditions precedent to making a loan, as well as *982 certain requirements regarding the terms of the loan.
a. Conditions Precedent to Making a Loan
Section 13(3) includes three conditions precedent: (1) the existence of “unusual and exigent circumstances”; (2) an “affirmative vote” of at least five members of the BoG authorising a Federal Reserve bank to take action permitted by the statute; and (3) “evidence that [an] individual, partnership, or corporation is unable to secure adequate credit accommodations from other banking institutions.” Id.; see 12 C.F.R. § 201.4(d) (2008) (stating that a Federal Reserve bank must determine that “failure to obtain such credit would adversely affect the economy” before extending emergency credit). Considered together, these conditions require that, during “unusual and exigent circumstances,” at least five members of the BoG must vote to authorize a Federal Reserve bank to make a loan, and then the authorized Federal Reserve bank must obtain evidence demonstrating that the borrower could not obtain financing from another banking institution. In effect, the Federal Reserve bank must be a lender of last resort.
b. Restrictions on the Loan’s Terms
Section 13(3) also places three restrictions on the terms of a loan: a loan must be (1) “at rates established in accordance with the provisions of [§ ] 357 of this title”; (2) “indorsed or otherwise secured to the satisfaction of the Federal [RJeserve bank”; and (3) “subject to such limitations, restrictions, and regulations as the [BoG] may prescribe.” 12 U.S.C. § 343. As to the first restriction, § 357 provides that “[e]very Federal [R]eserve bank shall have power to establish ..., subject to review and determination of the [BoG],” interest rates “to be charged by the Federal [R]e-serve bank for each class of paper, which shall be fixed with a view of accommodating commerce and business.” Id. § 357. Therefore, Federal Reserve banks must establish interest rates for a § 13(3) loan that “accomodat[e] commerce and business.” Id.
Second, the § 13(3) loan must be “indorsed or otherwise secured to the satisfaction of the Federal [R]eserve bank.” Id. § 343. Although this provision requires the Federal Reserve bank to secure the loan, it grants the Federal Reserve bank discretion by requiring that the loan be “secured to the satisfaction of the Federal [R]eserve bank.” Id. (emphasis added). In addition, the use of “otherwise” permits the Federal Reserve bank to exercise this discretion in selecting the form of security.
Third, the BoG “may prescribe” “limitations, restrictions, and regulations” on' the Federal Reserve bank’s loan. Id. (emphasis added). Because this provision employs permissive rather than mandatory language, the BoG has discretion over whether to prescribe additional limitations, restrictions, and regulations. Thus, this provision only is relevant when the BoG has elected to do so.
2. Other Provisions of the Federal Reserve Act
Because “[statutory construction ... is a holistic endeavor,” United Sav. Ass’n v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), “we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy,” United States v. Boisdoré’s Heirs, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1849). Thus, I evaluate how § 13(3) fits into the statutory scheme of Federal Reserve Act generally.
*983 When Congress passed the Federal Reserve Act in 1913, it conferred certain authority on Federal Reserve banks. See generally Pub. L. No. 63-43, 38 Stat. 251 (1913) (codified as amended in scattered sections of 12 U.S.C.). As relevant here, § 4(4) provides that the Federal Reserve banks
shall have power—
[[Image here]]
[t]o exercise by its board of directors, or duly authorized officers or agents, all powers specifically granted by the provisions of [the Federal Reserve Act] and such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by the [Federal Reserve Act],
12 U.S.C. § 341 (emphasis added). Section 4(4) thus expands upon the powers “specifically granted” by § 13(3) by granting “such incidental powers as shall be necessary to carry on the business of banking.” Id.
However, the statutory text limits these additional powers in two ways. First, the powers are “incidental,” and “an incidental power can avail neither to create powers which, expressly or by reasonable implication, are withheld nor to enlarge powers given; but only to carry into effect those which are granted.” First Nat’l Bank in St. Louis v. Mo., 263 U.S. 640, 659, 44 S.Ct. 213, 68 L.Ed. 486 (1924). Second, the incidental powers must be “within the limitations prescribed by the [Federal Reserve Act],” meaning they cannot contravene the limitations of § 13(3) and the remainder of the statute. Section 4(4) thus authorizes Federal Reserve banks to perform certain activities “necessary” to “the business of banking,” but these powers cannot exceed the authorized powers of the statute.
3. Similar Provisions in Statutes Related to § 13(3)
The interpretation of particular text from related statutes in the same Title of the United States Code also may inform the interpretation of the same or similar text in the statute at issue. See Sullivan v. Stroop, 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990) (interpreting “child support” in accordance with a closely-related statute using the same phrase). Relevant here, § 16 of the Banking Act of 1933, Pub. L. No. 73-66, 48 Stat. 162, 184-85 (codified as amended at 12 U.S.C. § 24), appears in the same title of the United States Code as §§ 4(4) and 13(3) of the Federal Reserve Act and is structured similarly to § 4(4), including the phrase “all such incidental powers as shall be necessary to carry on the business of banking.” 12 U.S.C. § 24. One notable difference between 12 U.S.C. § 24 and § 4(4) of the Federal Reserve Act, however, is that § 24 does not provide that incidental powers must be carried out “within the limitations prescribed by the [Federal Reserve Act]” like § 4(4). Compare 12 U.S.C. § 24, with id. § 341.
The regulation interpreting the “incidental powers” provision of 12 U.S.C. § 24 states that
[a] national bank may take as consideration for a loan a share in the profit, income, or earnings from a business enterprise of a borrower. A national bank also may take as consideration for a loan a stock warrant issued by a business enterprise of a borrower, provided that the bank does not exercise the warrant. The share or stock warrant may be taken in addition to, or in lieu of, interest.
12 C.F.R. § 7.1006 (emphasis added). This regulation indicates that “incidental powers” may include, at a minimum, taking shares or stock warrants “in addition to, or in lieu of, interest.” Id. To the extent 12 U.S.C. § 24 and 12 C.F.R. § 7.1006 inform *984 the interpretation of the Federal Reserve Act, this analysis would not differ with respect to §§ 13(3) or 4(4), unless the Federal Reserve bank was not acting “within the limitations” of other provisions of the Federal Reserve Act.
4. Legislative History
Although of lesser interpretative value, courts frequently rely on legislative history. See, e.g., Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 209, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994) (“The legislative history of the Mine Act confirms this interpretation.”). I have not identified any legislative history relevant to my interpretation of § 13(3).
5. Additional Considerations Related to § 13(3)
Finally, although not central to my interpretation, it is worth noting that § 13(3) of the Federal Reserve Act was enacted in 1932 at the height of the Great Depression. See Pub. L. No. 72-302, § 210, 47 Stat. 709, 715 (1932). While it was used over 100 times during the height of the Great Depression, the Court of Federal Claims found (and the parties do not contest) that the Federal Reserve Act was not used during the seventy-two years preceding the Great Recession of 2008. See Starr VI, 121 Fed.Cl. at 467. This lends mild support for an interpretation favoring broader powers, as the Federal Reserve Act was designed to prevent or mitigate significant financial crises. But cf. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 653, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).
D. The Court of Federal Claims Did Not Have Jurisdiction to Adjudicate Starr’s Illegal Exaction Claim
The Court of Federal Claims is a court of limited jurisdiction, as provided for by the Tucker Act. See 28 U.S.C. § 1491. To bring an illegal exaction claim pursuant to the Tucker Act, our precedent requires a plaintiff to assert a money-mandating source of substantive law and a violation of the Constitution, a statute,, or. a regulation. Because § 13(3) neither is money-mandating nor prohibits the Federal Reserve banks from taking equity, the Court of Federal Claims did not have Tucker Act jurisdiction to adjudicate Starr’s illegal exaction claim. I address these issues in turn.
1. Section 13(3) Is Not Money-Mandating as Required for Court of Federal Claims Jurisdiction Pursuant to the Tucker Act
When determining whether a statute is money-mandating, we ask whether the statute is “reasonably amenable to the reading that it mandates a. right of recovery in damages.” White Mountain, 537 U.S. at 473, 123 S.Ct. 1126. Based on my review of the text of § 13(3), I agree with the Court of Federal Claims that “[§ ] 13(3) does not contain express ‘money-mandating’ language..,. ” Starr VI, 121 Fed.Cl. at 465. There simply is no language in the statute discussing the Government’s payment of money damages. Nor is § 13(3) “reasonably amenable” to such a reading. White Mountain, 537 U.S. at 473, 123 S.Ct. 1126. Section 13(3) permits Federal Reserve banks to serve as a lender of last resort in “unusual and exigent circumstances.” 12 U.S.C. § 343. It empowers the Federal Reserve banks to mitigate financial crises; it does not enable a borrower to bring a money claim (or any other claim) against the Federal Reserve banks or any other Government entity. Therefore, even if the Government violated § 13(3), it would not be obligated to pay money damages.
2. The Government’s Actions Were Authorized Because § 13(3) Does Not Prohibit the Taking of Equity
The Court of Federal Claims lacked jurisdiction over Starr’s illegal exaction claim *985 for the separate reason that Congress authorized the Government to take equity via § 13(3). Illegal exaction claims depend upon unauthorized Government conduct, see Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007 (Ct. Cl. 1967) (stating that illegal exaction claims may be brought when money “was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation”), but “[t]he [Government action upon which the taking[] claim is premised must be authorized, either expressly or by necessary implication, by some valid enactment of Congress,” Short v. United States, 50 F.3d 994, 1000 (Fed. Cir. 1995) (emphasis added). The Government’s action here, i.e., the taking of an equity stake, was authorized pursuant to § 13(3).
Although § 13(3) does not reference the taking of equity in a company expressly, the statute gives the Federal Reserve banks discretion on how the loan is secured. Section 13(3) places two primary restrictions on the terms of a loan. First, the Federal Reserve banks must make loans “at rates established in' accordance with the provisions of [§ ] 357 of this title.” 12 U.S.C. § 343. While this prohibits the Federal Reserve banks from setting interest rates that do not “accommodat[e] commerce and business,” id. § 357, it does not prohibit the Federal Reserve banks from obtaining other forms of security. Second, these loans must be “indorsed or otherwise secured to the satisfaction of the Federal [RJeserve bank.” Id. § 343. By stating that the loan may be “otherwise secured to the satisfaction of the Federal [R]eserve bank,” § 13(3) gives the Federal Reserve bank discretion over the form and amount of the security obtained from the borrower. Providing equity is a common method for securing a loan. See, e.g., J.A. 400175 (stating that taking equity is “common practice in the banking industry”). Thus, obtaining equity as collateral falls within the powers authorized by § 13(3).
The inquiry may not end there, however, as the statute must be viewed as a whole. United Sav. Ass’n, 484 U.S. at 371, 108 S.Ct. 626. Viewing the statute as a whole reinforces this interpretation. Section 4(4) of the Federal Reserve Act expands upon the powers “specifically granted” by § 13(3) by granting “such incidental powers as shall be necessary to carry on the business of banking.” 12 U.S.C. § 341. It is true that incidental powers may not exceed the authorized powers, but § 13(3) provides the Federal Reserve banks with the power to lend and grants significant discretion to formulate loan terms. Accepting equity as collateral for a loan would not exceed the Federal Reserve banks’ lending power; it would enable lending. See NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 258 n.2, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) (Section 24 does not limit an official’s authority “to the enumerated powers” in that statute, because the official “has discretion to authorize activities beyond those specifically enumerated,” so long as that discretion is “kept within reasonable bounds. Ventures distant from dealing in financial investment instruments — for example, operating a general travel agency — may exceed those bounds.”).
Considering the entire statutory framework, I would find that § 13(3) is not money-mandating and otherwise authorizes Federal Reserve banks to take equity to secure loans. Because Starr’s illegal exaction claim was premised on the purported money-mandating nature of § 13(3) and the Government’s purported violation of § 13(3) by taking a 79.9% equity stake in AIG, the Court of Federal Claims lacked jurisdiction to adjudicate Starr’s illegal ex *986 action claim.[5]
E. The Court of Federal Claims Had Jurisdiction to Adjudicate Starr’s Taking Claim
Having found the Government liable for illegally exacting Starr’s property, the Court of Federal Claims forewent consideration of Starr’s taking claim under the Fifth Amendment. See Starr VI, 121 Fed.Cl. at 472 (determining that Starr’s taking claim could not be decided due to the finding of an illegal exaction, because “the same government action cannot be both an unauthorized illegal exaction and an authorized taking”). Because I would find that Starr’s illegal exaction claim must be dismissed for lack of jurisdiction, I now turn to whether the Court of Federal Claims had jurisdiction to adjudicate Starr’s taking claim.
The Fifth Amendment provides, inter alia, that “private property [shall not] be taken for public use, without just compensation.” U.S. Const. amend. V. Because the Takings Clause inherently is money-mandating, see Jan’s Helicopter, 525 F.3d at 1309, Starr was not required to allege a separate money-mandating source of law. Instead, Starr was only required to (1) “identify] a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking” and (2) plead that the “property interest was ‘taken’ ” without just compensation through authorized Government action. Acceptance Ins. Cos. v. United States, 583 F.3d 849, 854 (Fed. Cir. 2009); see Del-Rio Drilling Programs, Inc. v. United States, 146 F.3d 1358, 1362 (Fed. Cir. 1998) (“A compensable taking arises only if the government action in question is authorized.”).
Starr satisfied these requirements. As to the cognizable property interest, “a court must look to existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law, that define the dimensions of the requisite property rights for purposes of establishing a cognizable taking.” Klamath Irrigation Dist. v. United States, 635 F.3d 505, 511 (Fed. Cir. 2011) (internal quotation marks, brackets, and citation omitted). Shares and voting power are property interests pursuant to Delaware law. See, e.g., Del. Code Ann. tit. 8, § 159 (West 1983) (“The shares of stock in every corporation shall be deemed personal property....”); Gatz v. Ponsoldt, 925 A.2d 1265, 1278 (Del. 2007) (discussing voting power). Starr thus alleged a cognizable property interest by claiming dilution and loss of voting power. Starr also alleged that the Government took 562,868,-096 shares of AIG common stock without due process or just compensation. Starr II, 106 Fed.Cl. at 54. Finally, as explained above, the Government’s actions were authorized under § 13(3). See supra Section I.D.2. For these reasons, the Court of Federal Claims had jurisdiction to adjudicate Starr’s taking claim.
III. Standing
Having determined that the Court of Federal Claims did not have jurisdiction to *987 adjudicate Starr’s illegal exaction claim but that it did have jurisdiction to adjudicate Starr’s taking claim, I now turn to whether Starr had standing to bring its taking claim in federal court.[6] “Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation.” Nat’l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 255, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (citation omitted).
“The party invoking federal jurisdiction bears the burden of establishing” standing, Lujan v. Defs. of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); and this burden increases as the litigation progresses:
At the pleading stage, general factual allegations of injury resulting from the defendant’s conduct may suffice.... In response to a summary judgment' motion ,.., the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts.... And at the final stage, those ■ facts (if controverted) must be supported adequately by the evidence adduced at trial.
Id. (internal quotation marks and citations omitted). The Court of Federal Claims addressed standing over five opinions.[7] However, as will be explained more fully below, the Court of Federal Claims never conducted a standing analysis pursuant to the three elements prescribed by the Constitution, and it only addressed whether the Government had the requisite control to form the basis of a direct claim, as required by Delaware law, at the pleading stage of the litigation. The majority commits the same error here, Maj. Op. 983 (articulating the three elements of constitutional standing and stating “we assume arguendo — as the parties do — that Starr has satisfied the requirements of constitutional standing derived from Article III”), despite Supreme Court precedent cautioning against such assumptions, see, e.g., Steel Co. v. Citizens for Better Env’t, 523 U.S. 83, 94-97, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (criticizing the appellate court for “‘assuming’ jurisdiction” rather than deciding jurisdictional issues such as Article -III standing at the outset).[8] I first *988 provide additional details regarding the constitutional standing requirements under Article III and then analyze one of the elements in particular — i.e., injury in fact.
A. Starr Does Not Satisfy the Constitutional Requirements for. Standing
1. Constitutional Standing Requirements The Constitution delegates certain powers across the three branches of the Fed *989 eral Government and places limits on those powers. See INS v. Chadha, 462 U.S. 919, 951, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (The Constitution “divide[s] the delegated powers of the ... [F]ederal [Government into three defined categories, legislative, executive^] and judicial, to assure ... that each Branch of government ... confine[s] itself to its assigned responsibility.”). “Article III of the Constitution” discusses the powers granted to the Judicial Branch and, inter alia, “confines the judicial power of federal courts to deciding actual ‘Cases’ or ‘Controversies.’ ” Hollingsworth v. Perry, — U.S. —, 133 S.Ct. 2652, 2661, 186 L.Ed.2d 768 (2013) (quoting U.S. Const. art. III, § 2).
“Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy” required by Article III. Spokeo, Inc. v. Robins, — U.S. —, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). The Supreme Court has established three elements comprising the “irreducible minimum” necessary to establish standing under the Constitution. Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The party invoking federal jurisdiction must demonstrate that it has “(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.” Spokeo, 136 S.Ct. at 1547 (citations omitted).
2. Starr Has Not Shown That It Suffered an Injury in Fact
Although the party invoking federal jurisdiction must satisfy these constitutional minimum requirements at each stage of the litigation, the parties failed to address these elements in their briefs. This does not, however, prevent us from considering the issue. See Bender, 475 U.S. at 546, 106 S.Ct. 1326 (holding that courts can raise standing sua sponte). Therefore, we first consider the constitutional elements of standing.
The “[fjirst and foremost” element of the constitutional standing inquiry is whether Starr has shown injury in fact. Citizens for Better Env’t, 523 U.S. at 103, 118 S.Ct. 1003 (citation omitted). “To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.” Spokeo, 136 S.Ct. at 1548 (internal quotation marks and citation omitted). Because the Court of Federal Claims tried the case, Starr must show standing through “facts (if controverted) ... supported adequately by the evidence adduced at trial.” Lujan, 504 U.S. at 561, 112 S.Ct. 2130 (internal quotation marks and citation omitted).
Starr cannot show injury in fact because Starr’s injury was not particularized. “Particularization is necessary to establish injury in fact.” Spokeo, 136 S.Ct. at 1548. “For an injury to be particularized, it must affect the plaintiff in a personal and individual way.” Id. (internal quotation marks and citation omitted). Neither the Court of Federal Claims nor Starr has presented any evidence that Starr’s injury was particularized. In fact, Starr acknowledged that “[e]ach of the actions taken by the Government had an effect that was shared across all of the common stock on a ratable basis, share for share” in support of class certification. J.A. 501694 (emphases added) (internal quotation marks and citation omitted); Oral Argument 8:15-8:37, http://oralarguments.cafc.uscourts.gov/ default.aspx?fl-2015-5103.mp3 (“Starr was not affected any differently than other shareholders with respect to the fact that *990 it lost 80% of its voting control.... [I]t was not proportionally affected differently.”).
In an effort to show injury in fact, Starr attempts to analogize its position to the shareholders in Alleghany Corp. v. Breswick & Co., 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957). Starr Resp. & Reply 33-34. However, these arguments are unpersuasive. In Alleghany, the Supreme Court held the shareholders had direct standing to sue because the “new preferred stock issue ... is convertible, and under the relevant notions of standing, the ... dilution of the equity of the common stockholders provided sufficient financial interest to give them standing.” 353 U.S. at 160, 77 S.Ct. 763 (internal quotation marks omitted). But Alleghany was “not a case ... where the injury feared [was] the indirect harm which may [have] resulted] to every stockholder from harm to the corporation.” Id. at 159-60, 77 S.Ct. 763 (internal quotation marks and citation omitted). Instead, the “minority common stockholders” in Alleghany suffered injury that was distinct from the other stockholders. Id. at 158-60, 77 S.Ct. 763. Starr’s alleged injury, in contrast, “is the indirect harm which may result to every stockholder from harm to the corporation,” which “is clearly insufficient to give ... standing independently to institute suit.” Pittsburgh & W. Va. Ry. Co. v. United States, 281 U.S. 479, 487, 50 S.Ct. 378, 74 L.Ed. 980 (1930). Thus, Starr has failed to show particularization of its purported injury in fact.
Because Starr has not met its burden of showing that its injury was particularized through facts supported by the evidence adduced at trial, it cannot show injury in fact.[9] As a result Starr cannot demonstrate the “irreducible minimum” elements of constitutional standing. Therefore, I need not address the second and third elements of standing, i.e., traceability and redressa-bility, nor do I, for the purposes of a constitutional standing analysis, need to consider the parties’ arguments as to standing under Delaware law.[10] For these reasons, I would hold that Starr does not have constitutional standing to invoke federal court jurisdiction.
Conclusion
The Court of Federal Claims continuously deferred consideration of threshold issues of jurisdiction and constitutional standing. The majority does the same, avoiding difficult issues of jurisdiction and standing established by the Constitution and by statute in favor of state law. Rather *991 than perpetuate these errors, I prefer to evaluate the instant appeal using the requirements imposed by the Constitution, Congress, and the Supreme Court. Under this framework, I would find that the Court of Federal Claims did not have jurisdiction to adjudicate Starr’s illegal exaction claim and that Starr does not have standing to allege a Fifth Amendment taking without just compensation. Therefore, although my reasoning differs, I coneur-in-part on standing and concur-in-the-result that vacatur and remand is warranted. When the action returns to the Court of Federal Claims, it should be dismissed.

. The Court of Federal Claims certified two classes of shareholders, i.e., the Credit Agreement Shareholder Class and the Reverse Stock Split Shareholder Class, and reached different conclusions on the merits with respect to each. See Starr VI, 121 Fed.Cl. at 475. My analysis regarding jurisdiction and standing applies with equal force to both classes. Therefore, I refer to both classes collectively as Starr for ease of reference.

. Section 13(3) was amended in 2010. See Dodd-Frank Wall Street Reform & Consumer Protection Act § 1101(a), 12 U.S.C. § 343 (2010). However, because the relevant events for the purposes of this appeal occurred in 2008 and 2009, my analysis focuses on the statutory text in effect in 2008.

. While much of the Supreme Court precedent (including White Mountain) on Tucker Act jurisdiction involves claims pursuant to the Indian Tucker Act, the Supreme Court's analysis under the two statutes does not differ. See 28 U.S.C. § 1505 (2012) (describing the Court of Federal Claims’s Indian Tucker Act jurisdiction); White Mountain, 537 U.S. at 472, 123 S.Ct. 1126 (explaining that the Indian Tucker Act is the Tucker Act's "companion statute”).

. The Court of Federal Claims made this determination after reaching inconsistent positions as to whether an illegal exaction claim requires a money-mandating source: in one opinion, it held that an illegal exaction claim “is an exception to the general rule that the Due Process Clause of the Fifth Amendment is not money-mandating,” Starr II, 106 Fed.Cl. at 61, but it later reached the opposite conclusion, Starr VI, 121 Fed.Cl. at 464 (“The Due Process Clause does not contain a money-mandating provision, and therefore an illegal exaction claim requires reference to another statute or regulation to create jurisdiction in this [c]ourt.”).

. In reaching its conclusion that the Federal Reserve Bank of New York (“FRBNY”) violated § 13(3), the Court of Federal Claims cited draft memoranda, which it believed indicated positions taken by Mr. Scott Alvarez, General Counsel to the Federal Reserve. Starr VI, 121 Fed.Cl. at 469-70, 478. However, ample record evidence demonstrates that these were drafts authored by subordinates and were never authorized by Mr. Alvarez. See, e.g., J.A. 300162-67 (handwritten markup striking statement indicating that the Federal Reserve and the Treasury could not hold shares with voting rights); see also J.A. 100566 ("I didn't agree with that part of the memo or whole other parts of the memo, and, indeed, I struck — once I had the opportunity to read this, I struck whole parts of the memo, including that discussion.”). This constitutes clear error by the Court of Federal Claims.

. The parties briefed standing with respect to the illegal exaction claim rather than the taking claim, but I see no substantive difference in how this would affect the standing analysis. Therefore, even if the Court of Federal Claims had jurisdiction over Starr’s illegal exaction claim, my standing analysis would apply with equal force to that claim.

. In Starr Int'l Co. v. United States (Starr I), the Court of Federal Claims "reserve[d] judgment as to the scope of its jurisdiction and to Starr’s standing” pending the filing of the Government’s motion to dismiss. 103 Fed.Cl. 287, 289 n.1 (2012). In Starr II, the Court of Federal Claims determined that "Starr has pled facts sufficiently alleging ... harm to the suing stockholders independent of any harm to AIG and as such, has standing to advance its expropriation claim directly” and that ' "Starr has standing to challenge the FRBNY’s compliance with [§ ] 13(3) of the [Federal Reserve Act].” 106 Fed.Cl. at 62, 84. It then declined to reconsider these findings in Starr III, 107 Fed.Cl. at 379. In Starr Int’l Co. v. United States (Starr V), after AIG’s Board declined to bring a deriyative claim against the Government, the Court of Federal Claims held that "Starr has not demonstrated a reasonable doubt that the Board's decision is entitled to the presumption of the business judgment rule, and therefore has no standing to advance derivative claims on behalf of AIG.” 111 Fed.Cl. 459, 469 (2013). In addition, it “repeat[ed] its previous ruling that Starr has standing to pursue its illegal exaction claim.” Id. at 482. Finally, in Stair VI, the Court of Federal Claims simply noted that it “ha[d] addressed a number of jurisdictional and standing questions at earlier stages of this case.” 121 Fed.Cl. at 463.

. In justifying its disregard for constitutional standing, the majority acknowledges that “federal law dictates whether Starr has direct standing” but states that "the law of Delaware ... also plays a role.” Maj. Op. 965, *988 966, Undoubtedly, state law may play a role— a secondary one. See U.S. Const. art. VI, cl. 2 ("This Constitution ... shall be the supreme Law of the Land[,] and the [pudges in every [sjtate shall be bound thereby....”); Armstrong v. Exceptional Child Ctr., — U.S. —, 135 S.Ct. 1378, 1383, 191 L.Ed.2d 471 (2015) (explaining that courts “must not give effect to state laws that conflict with federal laws” (citation omitted)). The majority characterizes its analysis as one involving prudential considerations, but I disagree with its analysis for three reasons,
First, the majority appears to believe that Delaware law provides the applicable test for the prudential consideration of third-party standing, See Maj. Op. 985-88. However, federal law provides its own test for third-party standing, see Kowalski v. Tesmer, 543 U.S. 125, 131, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) ("[A] party seeking third-party standing [must] make two additional showings [in addition to the requirements of Article III], First, we have asked whether the party asserting the right has a 'close' relationship with the person who possesses the right. Second, we have considered whether there is a ‘hindrance’ to the possessor's ability to protect his own interests,” (citation omitted)), and the majority leaves unanswered the question of how these federal law requirements apply to Starr's claim.
Second, the substance of the majority's analysis is on state law, not concepts historically characterized as threshold prudential considerations in light of the Constitution.. See Maj. Op. 985-88. However, the Supreme Court has differentiated between prudential and state law standing requirements, explaining that constitutional and prudential considerations prevail over state law considerations. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 262 n.8, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) ("State law of standing, however, does not govern such determinations in federal courts. The constitutional and prudential considerations ... respond to concerns that are peculiarly federal in nature.” (citation omitted)); see also Lexmark, 134 S.Ct. at 1386, 1388 (explaining that the prudential standing label is "misleading” and that the relevant inquiry is “the meaning of the congressionally enacted provision creating a cause of action”); id. at 1387 n.4 (providing additional commentary on prudential considerations). Congress, not state courts, is responsible for establishing the bounds of these prudential considerations within Article Ill’s requirements. See Gladstone Realtors v. Vill. of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) (explaining that “Congress may, by legislation, expand standing” to encompass litigants otherwise “barred by prudential standing rules” but that “[i]n no event ... may Congress abrogate the Article] III minima” (emphasis added) (internal quotation marks and citations omitted)).
Third, even if the majority properly characterized its analysis as involving prudential considerations, an analysis of those factors would come only after addressing the constitutional minimum requirements. See McKinney v. U.S. Dep’t of Treasury, 799 F.2d 1544, 1549 (Fed. Cir. 1986) (“[T]he court must undertake a two-step analysis which involves both the constitutional limitations and the prudential limitations that circumscribe standing. As a threshold matter[,] the court must ensure that the litigant satisfies the requirements of Article III of the Constitution. Once the court determines that the litigant satisfies the constitutional aspects, it must consider ... prudential limitations...." (emphases added) (citations omitted)). Indeed, the majority of the cases in the majority's brief discussion of standing .under federal law, Maj. Op. 983-86 & nn.16-18, first address “the constitutional requirements of Article III” before "nonconstitutional prudential considerations,” Franchise Tax Bd. v. Alcan Aluminium Ltd., 493 U.S. 331, 335, 335-38, 110 S.Ct. 661, 107 L.Ed.2d 696 (1990); see, e.g., Lexmark, 134 S.Ct. at 1386 ("satisfjying]” itself of "standing under Article III” before turning to prudential considerations); Singleton v. Wulff, 428 U.S. 106, 112-18, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (explaining that the first inquiry is Article Ill’s constitutional standing requirements and the second inquiry is prudential considerations and then addressing these considerations in turn).

. The majority mischaracterizes the “sole basis” of my conclusion as the "number of people affected.” Maj. Op. 964-95 n.16. This is inaccurate. My conclusion is based on Starr's failure to meet its burden of showing that its alleged injury was distinct from the remaining AIG shareholders’ injury and was not an injury stemming from an indirect injury to the corporation, as instructed by Pittsburgh. See 281 U.S. at 487, 50 S.Ct. 378. Moreover, had Starr demonstrated that any alleged harm was particularized, several hurdles remained to establishing injury in fact. For example, the Court of Federal Claims determined that, absent Government intervention, Starr’s shares would have been valueless. See Starr VI, 121 Fed.Cl. at 474 (stating that “[t]he inescapable conclusion is that AIG would have filed for bankruptcy, most likely during the week of September 15-19, 2008,” and that “the value of the shareholders^] common stock would have been zero”). That finding suggests a lack of an injury in fact. Beyond the injury in fact requirement, Starr also would be required to demonstrate satisfaction of the remaining Article III requirements.

. While I agree with the majority's analysis under the “dual-nature exception” in Delaware corporate law (to the extent it is applicable), I would not reach that issue because Starr lacks constitutional standing.